**LITHCOTE COMPANY, Appellant,**

v.

**Chet BALLENGER, Appellee.**

No. 90–46.

Court of Appeals of Iowa.

April 2, 1991.

Harry W. Dahl, Des Moines, for appellant.

J. Nicholas Russo, Iowa City, for appellee.

Considered by DONIELSON, P.J., and HAYDEN and SACKETT, JJ.

DONIELSON, Presiding Judge.

The employer-appellant, Lithcote Company (Lithcote), seeks review of the findings of fact, conclusions of law, and judgment filed December 13, 1989, affirming the appeal decision of the industrial commissioner filed on December 30, 1988. In the appeal decision, the commissioner affirmed with modification an arbitration decision filed by a deputy industrial commissioner who concluded: claimant-appellee sustained an injury to his back on January 16, 1984, resulting in damage to the L4–5 intervertebral lumbar disc and L5–S1 intervertebral lumbar disc; claimant was entitled to healing period benefits from January 19, 1984, until August 26, 1985, except for a five-day period; and claimant had sustained a thirty percent industrial disability. The deputy commissioner also ordered the employer to pay the costs of the action. The commissioner modified the decision to disallow the claimant reimbursement for production of duplicative evidence, but affirmed the balance of the decision. Lithcote appealed and the district court affirmed.

Lithcote appeals. It maintains the district court erred in: 1) finding that the employee had injured two lumbar discs rather than one on the date of his injury; 2) determining the length of the healing period; and 3) affirming the excessive award of industrial disability. We now affirm.

The claimant, Chet Ballenger, was twenty-seven years old at the time of the hearing. He had a family and had left school after the eighth grade to work. Prior to working for Lithcote, he had worked in a variety of jobs, including bartending, commercial fishing, clamming, carpentry, painting, masonry work, plumbing, and electrical work. Most of these jobs required hard physical exertion.

On January 16, 1984, the date Ballenger injured his back, he was working as a "helper." This involved inspecting, cleaning, and painting railroad cars. Ballenger was inside a railroad car using a grinder when the scaffold on which he was standing shifted. Ballenger fell. At the time of the injury, he noticed only a skinned leg. However, after a couple of days Ballenger began to notice numbness in his feet. He then sought professional medical attention.

To summarize a rather lengthy medical history, Ballenger saw several physicians, received different and sometimes conflicting medical advice, and underwent several different types of treatment, including surgery. His overall condition following the fall was never completely the same. His treating physician placed lifting restrictions on him.

Following the injury Ballenger felt he was medically incapable of performing the same type of work he had previously performed. With the exception of a five-day period when he made an unsuccessful attempt, Ballenger did not return to work until August 26, 1985. Ballenger then worked painting stencils on the sides of railroad cars.

By the time of the hearing before the industrial commissioner, Ballenger's injuries included damage to his L4–5 intervertebral lumbar disc and also to the L5–S1 intervertebral lumbar disc. The bulging of these discs encroached upon nerve roots in his spine. He had developed degenerative arthritis. He was still experiencing pain and was taking prescription medication. The dispute before the commissioner centered around whether the fall had caused the injuries to both discs or to only one of them. After considering the conflicting medical testimony, the commissioner concluded all of the back injuries were caused

by the work-related fall. The district court affirmed the commissioner.

**I.** *Scope of Review.* Our scope of review is limited. We review to determine whether the agency decision is supported by substantial evidence when viewing the record as a whole. *See Chauffeurs, Teamsters and Helpers, Local Union No. 238 v. Iowa Civil Rights Commission,* 394 N.W.2d 375, 379 (Iowa 1986). Evidence is substantial to support an agency's decision when a reasonable person would find it adequate to reach the given conclusion. *Mercy Health Center v. State Health Facilities,* 360 N.W.2d 808, 811–12 (Iowa 1985). The question is not whether the evidence might support a different finding but whether the evidence supports the findings actually made. *Henry v. Iowa Dept. of Job Service,* 391 N.W.2d 731, 734 (Iowa App.1986). The fact that two inconsistent conclusions can be drawn from the evidence does not mean that one of those conclusions is unsupported by substantial evidence. *Id.* The requirement that we take all record evidence into account in reviewing administrative findings does not detract from our duty to grant appropriate deference to the agency's expertise. *Cerro Gordo County Care Facility v. Iowa Civil Rights Commission,* 401 N.W.2d 192, 195–96 (Iowa 1987).

II. *Injury.* The employer first contends it was error to find Ballenger sustained an injury to both the L4–5 and L5–S1 disc levels on January 16, 1984. The industrial commissioner found the assessment of Ballenger's medical case, as determined by Doctors Beck and Neiman, as correct, as opposed to the assessments of other physicians. The employer contends it was error to accept this assessment because it was contrary to the diagnoses of the other physicians, including the claimant's treating physician. These physicians did not attribute the claimant's fall as the cause of the injury to the L5–S1 disc.

**Here, the claimant has the burden** of proving by a preponderance of the evidence that the disability on which he now bases his claim is causally related to injuries arising out of and in the course of his employment. *See* Iowa Code § 85.20; *cf. Bodish v. Fischer, Inc.,* 257 Iowa 516, 519, 133 N.W.2d 867, 869 (1965). The question of causal connection is "essentially within the domain of expert testimony." *Id.* at 521, 133 N.W.2d at 870 (quoting *Bradshaw v. Iowa Methodist Hospital,* 251 Iowa 375, 383, 101 N.W.2d 167, 171 (1960)). However, the weight to be given the expert opinion is for the agency as fact finder. *Id.; see also Rockwell Graphic Systems, Inc. v. Prince,* 366 N.W.2d 187, 192 (Iowa 1985). Expert opinion testimony, even if uncontroverted, may be accepted or rejected in whole or in part by the trier of fact. *Sondag v. Ferris Hardware,* 220 N.W.2d 903, 907 (Iowa 1974).

**Our supreme court has already** rejected the argument that a treating physician's testimony should be, as a matter of law, given more weight than that of a later physician who examines the patient in anticipation of litigation. *Rockwell,* 366 N.W.2d at 192. Lithcote nonetheless claims the commissioner should have given greater weight to the opinion of Dr. Naden, the treating physician. We reiterate, the weight to be given an expert's opinion is for the trier of fact.

The industrial commissioner considered all the conflicting evidence concerning the cause of the injury to Ballenger's L5–S1 disc. The commissioner analyzed the conflicting evidence as follows:

[Lithcote] argues that initial impression by medical personnel and Dr. Naden's opinion should be accepted that the L5–S1 herniation occurred subsequent to the L4–5 herniation. [Lithcote] argues that Dr. Beck's and Dr. Neiman's opinion that the two herniations occurred at the same time should be rejected. While there is [sic] conflicting opinions from the physicians in this case, there is general agreement that after the work injury there were two abnormalities in the L4–5 and L5–S1 area. The disagreement lies in whether one of these abnormalities was a free fragment or a bulging disc at L5–S1. Dr. Naden's post-operative diagnosis changed after the laminectomy. The 1985 myelogram and the laminectomy it-

self revealed a bulging L5–S1 disc and neither revealed a free fragment. Dr. Naden's reluctance to causally connect the work injury to the L5–S1 disc herniation appears to be based upon the difference in the discs he observed during the laminectomy. Dr. Beck and Dr. Neiman both explained that the difference in the discs would be attributed to the fact the chymopapain had been injected into the L4–5 disc but not into the L5–S1 disc. Their explanation in this regard appears to be undisputed. Dr. O'Dell's observation on January 19, 1984[,] which was three days after the work injury was that the left Achilles reflex was absent. Drs. Beck and Neiman indicated that the Achilles reflex impairment is highly specific for an S1 nerve root problem. Drs. Beck and Neiman offered opinions and explanations consistent with objective evidence in this case. Also, their explanations as to the diagnosis and possible confusion of early diagnosis is more descriptive and is reasonable. Their opinions are adopted as correct.

The commissioner's finding that Ballenger sustained injury to both the L4–5 and L5–S1 discs on January 16, 1984, is supported by the opinions of Doctors Beck and Neiman. The commissioner explained his reliance upon the doctors' conclusions as being consistent with the objective evidence, more descriptive than those of the other physicians, and reasonable. The commissioner also noted that Dr. Naden had not been consistent in his diagnosis of Ballenger's injuries. The district court determined substantial evidence supported the agency's conclusion that both discs were injured on January 16, 1984. We agree and therefore affirm.

III. *Healing Period.* The commissioner and district court both found that Ballenger's healing period lasted from Jan-

uary 19, 1984, to August 26, 1985, except for five days from April 29, 1985, through May 3, 1985. The employer takes the position that the healing period should have ended on July 23, 1984—the date when the treating physician opined that Ballenger had reached his maximum medical improvement.[1]

We first note that evidence adduced at the hearing does not support Lithcote's contention that no further improvement of Ballenger's condition was anticipated by Dr. Naden on July 23, 1984. Dr. Naden, the treating physician, opined only that Ballenger had reached maximum benefit *without surgery.* Dr. Naden was not consistent in his recommendations to Ballenger; at times Dr. Naden recommended the surgery and at times he indicated Ballenger's condition would not be improved by surgery. Ballenger never specifically declined surgery but rather continued to seek other medical opinions. Ballenger's condition continued to improve after July 1984. Dr. Naden did not authorize Ballenger to return to work in any capacity until April 1985. This attempt to return to work was unsuccessful and Ballenger eventually had surgery in June 1985. Ballenger returned to work on August 26, 1985.

The commissioner concluded that it was not possible to determine from Dr. Naden's opinion when Ballenger reached maximum medical improvement. This conclusion is supported by the record. In the absence of a finding of maximum medical improvement, the commissioner relied upon the date the claimant returned to work to fix the healing period time frame. The commissioner concluded Ballenger's healing period ran from January 19, 1984, through August 26, 1985, except for the five days he returned to work. We affirm.

---

1. The employer cites Iowa Code section 85.34(1) in support of its position. That subsection provides, in pertinent part:

    If an employee has suffered a personal injury causing permanent partial disability for which compensation is payable as provided in subsection 2 of this section, the employer shall pay to the employee compensation for a healing period, as provided in section 85.37,

    *beginning on the date of injury, and until* [1] the employee has returned to work or [2] it is medically indicated that significant improvement from the injury is not anticipated or [3] until the employee is medically capable of returning to employment substantially similar to the employment in which the employee was engaged at the time of injury, *whichever occurs first.* (Emphasis added.)

IV. *Industrial Disability.* Lithcote's last contention is that a thirty percent industrial disability rating was excessive. Industrial disability, within the meaning of the worker's compensation statute, means reduced earning capacity. *Guyton v. Irving Jenson Co.*, 373 N.W.2d 101, 103 (Iowa 1985). Among factors to be considered are the employee's bodily impairment, age, intelligence, education, qualifications, experience, and the effect of the injury on the worker's ability to obtain suitable work. *Id.* There are no guidelines establishing the weight to be given to each of the factors. Rather, it is necessary for the commissioner to draw upon prior experience and general and specialized knowledge to make a finding in regard to the degree of industrial disability. It is in this context that we review the evidence.

The industrial commissioner concluded that Ballenger has approximately twenty percent functional impairment of the body as a whole due to his back problems caused by the fall. Given Ballenger's limited formal education and entire work history, the commissioner found a thirty percent permanent impairment of earning capacity. The district court affirmed.

We find no reason to disturb the decisions of the commissioner and the district court in this regard.

AFFIRMED.

HAYDEN, J., concurs.

SACKETT, J., dissents.

SACKETT, Judge (dissenting).

I dissent.

Respondent reported the fall and thought he had only skinned his leg. Two days later he began to notice numbness in his feet. He was unable to work on Monday, January 19, 1984. On the 19th, he consulted Dr. Mark O'Dell, complaining of back pain and numbness in his calf and left foot. Dr. O'Dell recommended bed rest for three days. Respondent returned to see O'Dell on January 25, 1984, and on January 27, 1984, O'Dell referred respondent to Dr. David C. Naden, a board certified orthopedic surgeon.

Dr. Naden examined respondent on January 26, 1984. He initially diagnosed a probable herniated nucleus pulposis at either the L4–5 or L5–S1 level with either a free fragment from the above level or a large free fragment at the L5–S1 level which compromised the first sacral nerve root on the left. A myelogram was performed on February 2, 1984. Dr. Richard Kundel, the physician who interpreted the myelogram, concluded respondent had a herniated intervertebral disc at the L4–5 level with a probable free fragment with nerve compression. Dr. Naden agreed with Dr. Kundel's diagnosis of a herniated disc at the L4–5 level with the free fragment just below the L4–5 level encroaching on the L5 nerve root. Dr. Naden suggested chemonucleolysis, but indicated surgery would probably be necessary. Prior to undergoing the injection, respondent obtained a second opinion from Dr. Harold J. Jersild, an orthopedic surgeon, who concurred with Dr. Naden's diagnosis and recommendations.

Intradiscal chemonucleolysis was performed at the L4–5 level on February 21, 1984. There were no complications. On June 25, 1984, Dr. Naden reported that the free fragment which had been diagnosed was still present and that further surgery was indicated. On July 10, 1984, Dr. Naden reported that respondent did not want to have the surgery and he was improving. Dr. Naden said as long as respondent felt he was improving that Dr. Naden would not recommend surgery and respondent would get along as well without the surgery as he would with it.

Dr. Jersild saw respondent again on June 6, 1984. He apparently agreed with Dr. Naden that if respondent felt he was improving he should continue under his present program of rehabilitation exercises rather than have surgery.

On October 26, 1984, respondent was examined by Dr. James A. Lehman and Dr. Tozzi at the University of Iowa Hospitals. The doctors reviewed radiographic studies and determined there was a myelographic defect at the L4–5 interspace bilaterally

with amputation of the L5 nerve root bilaterally, with a large extradural defect on the left, ventrally, behind the body of L5. Dr. Lehman and Dr. Tozzi agreed with Dr. Naden, Dr. Kundel and Dr. Jersild respondent had a free fragment from the L4–5 disc which could be the cause of his complaints. Dr. Lehman and Dr. Tozzi also agreed with Dr. Naden and Dr. Jersild as long as respondent expressed gradual improvement he could forego surgery. They reported respondent's healing period had ended. They assigned a twenty percent permanent impairment rating.

Dr. Naden reported respondent had reached maximum medical improvement on January 23, 1984, although he stated there would be minimal nonsignificant improvement. He gave respondent a fifteen percent permanent impairment of the whole body.

Respondent was examined by Dr. Raul E. Espinosa and Dr. Steven Stein at the Mayo Clinic on January 21, 1985. The doctors reported respondent's neurological examination was normal except for subjective complaints of diffuse percussion tenderness in the low back, difficulty in lumbar flexion and pain with straight leg raising at seventy percent on the right and fifty percent on the left. The doctors interpreted respondent's radiographic studies as showing a large lumbosacral disc protrusion and a midline disc protrusion at the L4 level.

Respondent returned to work on April 26, 1985. He saw Dr. Naden on May 28, 1985, and a myelogram was performed on June 4, 1985. Dr. Kundel interpreted the myelogram results as showing probable disc herniation on the left side at the L4–5 and L5–S1 level.

Respondent was hospitalized and a laminectomy was performed at the L4–5 and L5–S1 levels with extraction of the herniated disc and intradiscal material. The claimant's recovery was uneventful. Dr. Naden released respondent for work on August 26, 1985, and respondent returned to work that day.

Dr. Naden reported the L5–S1 level was normal at the time of the 1984 myelogram. He indicated respondent's L4–5 disc prob-

lem was related to his work. Dr. Naden did not feel that there was a causal connection between the herniation of the L5–S1 level and the work injury. Dr. Naden reported during the laminectomy surgery he observed a difference in appearance between the disc at the L4–5 level and the L5–S1 level. This indicated to him the L4–5 injury had preceded the L5–S1 herniation. Dr. Naden said the existence of fibrosis and scarring found at the time of his surgery was the result of degradation of the free fragment he observed in the 1984 myelogram.

Dr. Donald C. Young, a board certified radiologist who also specializes in nuclear medicine, evaluated respondent's radiographic studies and also interpreted the 1984 myelogram as showing a bilateral L4–5 disc protrusion with a free fragment overlying the L5 intervertebral disc on the left which displaced the S1 nerve root. This verified the findings of Dr. Kundel, Dr. Naden, Dr. Lehman and Dr. Tozzi. Dr. Young interpreted the subsequent 1985 myelogram as showing a defect at the L4–5 level which was less pronounced than the 1984 myelographic study. Dr. Young indicated there was asymmetry at the left side of the L5–S1 level, which he felt was possibly due to a free fragment. He reported no indication of a herniated disc but felt there could be a protruding disc.

Respondent's attorney arranged to have respondent evaluated by Dr. David Beck, a neurosurgeon, on May 20, 1986. Dr. Beck evaluated respondent and determined respondent had injured both the L4–5 and L5–S1 discs on January 16, 1984. This diagnosis was not consistent with the diagnosis of the physicians who had examined respondent earlier or with the diagnosis of Dr. Naden, the physician who operated on respondent and observed the discs. Dr. Beck also disagreed with the examining physicians and Dr. Naden there was a free fragment resulting from the injury to the L4–5 intervertebral disc. Dr. Beck later testified he did not know if disc fragments disappear and he would not exclude the possibility of a free fragment. He also agreed Dr. Naden, the treating physician,

**70**

was in a better position to observe respondent's condition and make a diagnosis.

Dr. Beck gave respondent a thirty percent impairment based on his interpretation respondent had injured both the L4–5 and L5–S1 levels in the January 16, 1984 fall.

Respondent's attorney also had Dr. Richard F. Neiman evaluate respondent. Dr. Neiman testified he felt respondent sustained damage to the L4–5 and L5–S1 discs at the time of the January 16, 1984 injury. Dr. Neiman further testified he felt respondent sustained a twenty-five percent permanent impairment. His rating was based on respondent having injured two discs on January 16, 1984.

The employer first contends it was error to find respondent sustained an injury to both the L4–5 and L5–S1 disc levels on January 16, 1984. The industrial commissioner found the assessment of respondent's medical case as determined by Doctors Beck and Neiman as correct, as opposed to the assessments of the other physicians. No reasons were given for this finding. The trial court made substantially the same finding, also without reasons.

The employer acknowledges the doctors found respondent had injured two discs in the January 16, 1984 fall. It contends, however, it was erroneous to accept its assessment because it was contrary to the diagnosis of all the doctors who had treated the respondent over a period of time, and it was also contrary to the diagnosis of the surgeon who operated on respondent and was, therefore, in a superior position to observe the conditions.

We review to determine whether the agency decision is supported by substantial evidence when viewing the record as a whole. *See Chauffeurs, Teamsters and Helpers, Local Union No. 238 v. Iowa Civil Rights Commission*, 394 N.W.2d 375, 379 (Iowa 1986). The requirement that we take all record evidence in account in reviewing administrative findings does not detract from our duty to grant appropriate deference to the agency's expertise. *Cerro Gordo County Care Facility v. Iowa Civil Rights Commission*, 401 N.W.2d 192, 195–

96 (Iowa 1987). We give respect to the agency's findings, but they must be set aside when the record clearly shows the agency decision was not justified. *Id.*

Evidence is substantial to support an agency decision if a reasonable person would find it adequate to reach the given conclusion. *Mercy Health Center v. State Health Facilities*, 360 N.W.2d 808, 809 (Iowa 1985). The agency finding is in accord with an opinion of two doctors who only evaluated claimant. The finding is contrary to the opinion of all of claimant's treating physicians, including the surgeon who operated on claimant and visibly viewed the discs. I find under this record the decision of the commissioner should be modified to find that claimant only suffered a herniated disc at L4–5.

I would remand to the agency to reevaluate the industrial disability and healing period in accord with this finding.