270 P.3d 917

**STATE of Arizona, Appellee,**

v.

**Jonathan Leigh SOSNOWICZ, Appellant.**

**No. 1 CA–CR 10–0789.**

Court of Appeals of Arizona, Division 1, Department E.

March 8, 2012.

As Amended July 25, 2012.

91

Thomas C. Horne, Attorney General by Kent E. Cattani, Chief Counsel, Criminal Appeals/Capital Litigation Division and W. Scott Simon, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Neal W. Bassett, Phoenix, Attorney for Appellant.

## OPINION

HALL, Judge.

¶ 1 Jonathan Leigh Sosnowicz (defendant) appeals his convictions and sentences for one count of second degree murder and three counts of aggravated assault. Defendant claims the trial court erred by allowing the medical examiner to testify that the manner of the victim's death was homicide. Under the circumstances presented here, although we agree with defendant that the medical examiner's opinion that the victim's death was a homicide was inadmissible, we con-

clude that the testimony was harmless error and affirm.[1]

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 Defendant was indicted on one count of second degree murder, a class 1 dangerous felony, and three counts of aggravated assault, class 3 felonies. The evidence at trial revealed that at approximately 2:00 a.m. on November 16, 2008, the now deceased victim, J.P., and his friends and family members were exiting a bar when a "white Hummer [ ] pulled in rather quickly, stopped … in a couple handicapped spots at an angle with the windows down, radio blaring." J.P.'s friend, Ryan, said to J.P. that "people that drive a Hummer have a small penis and they are trying to [over]compensate." Defendant's then-girlfriend, Leah T., testified that defendant heard the comment. Defendant was in the driver's seat of the vehicle and he responded, "I will whip it out right here if you want[.]" After more words were exchanged, J.P. said to defendant, "Stay in the vehicle. You don't want to do this. Stay in your car." J.P. positioned himself in front of the driver's side door and as defendant repeatedly attempted to get out of the vehicle, J.P. repeatedly told defendant to "stay in the car and leave." Nevertheless, defendant and the passengers exited the vehicle and defendant "spear tackled" J.P. to the ground. Ryan attempted to "get [defendant] off of [J.P.] and he wouldn't get off, then [Ryan] hit [defendant] in the side of the head." Defendant fell "on his back" and J.P. "hit" defendant in the face. Defendant appeared "dazed" and J.P. stood "up over [defendant and] put[ ] his hand down to help [defendant] up." J.P. pulled defendant up and told defendant "it's over" and "get out of here." Defendant appeared "angry" and "frustrated" and got back in the vehicle. Ryan testified that after defendant drove south and away from the area, he then "heard a rev and little bit of a screech, and turned around and saw the [Hummer] headed straight for us."

Ryan saw "the Hummer strike [J.P.] going over him" with "[t]he right side tires." Defendant then drove the Hummer out of the parking lot.

¶ 3 J.P.'s brother, Justin, testified that after the fist fight, defendant drove the Hummer "out of sight" and "left the parking area" with two of his friends. Justin saw the Hummer make a "screeching turn [and] sped up again." Justin stated that defendant failed to brake and then "str[uck] [J.P.] and thr[ew] him forward." Justin stated that the "front [and] back wheels went over the top of" J.P. Justin said that defendant immediately left the parking lot after hitting J.P. and Justin ran after the Hummer and attempted to break a window with his fist in order to assist the police in identifying the correct Hummer.

¶ 4 An acquaintance of J.P.'s, Alex, testified that between one and five minutes after defendant initially drove the Hummer away from the parking area, Alex heard the Hummer's "engine rev and [saw the Hummer's] lights turn on and the Hummer [was] going as fast as it could toward a group of people and … hit" J.P. Alex stated that defendant did not attempt to brake and did not attempt to swerve around J.P. Alex said that defendant drove away immediately after hitting J.P.

¶ 5 J.P.'s cousin, Leah L., testified that after the fist fight ended, a "[l]ittle bit of time passed," and then she heard "an engine revving" and saw the Hummer driving back through the parking lot "[m]uch faster" than it should have been driving. She saw "people scattering everywhere" and then "heard people screaming." She did not actually see defendant hit J.P. with the Hummer.

¶ 6 Carlos [2] testified that he had driven to the bar with his girlfriend to pick up her intoxicated brother at approximately 2:00–2:30 a.m. that morning. Carlos noticed people fighting and then a man "got mad," "pushed" a woman, and got into the driver's

---

1. In a separate memorandum decision filed contemporaneously herewith, we reject defendant's claim that the trial court also erred by precluding the medical examiner from disclosing the victim's blood alcohol content. *See* ARCAP

28(g); *see also* Ariz. R.Crim. P. 31.26; Ariz. R. Sup.Ct. 111(h).

2. Carlos did not know either J.P. or defendant.

seat of the Hummer. Carlos stated that the Hummer's engine "made a loud noise and [the driver] took off." The driver of the Hummer drove "too fast" at approximately forty miles an hour towards Carlos and had to "swerve to avoid" hitting him. The driver then drove "straight into a crowd and took off."

¶ 7 Defendant's defense to hitting and ultimately killing J.P. with the Hummer was that it was an accident. Defendant testified that he had been drinking at a bar for about three or four hours and left that bar and drove to a second bar. Defendant left the second bar for several minutes, bought cigarettes and withdrew two hundred dollars, and when he returned, he parked the Hummer near the door of the bar. Defendant went inside the bar to get his friends and girlfriend, and after they left the bar and got into the Hummer, someone approached his open window and began talking to him. Both rear passenger doors of the vehicle then flew open and defendant exited the vehicle to try to determine what was going on.[3] Defendant noticed his friend, Nicholas, lying on the ground, and defendant suddenly ended up on the ground, but could not explain how or why he was on the ground. He "kept hearing people . . . yell [and] felt like [he] was being taunted." Defendant stated he "got in the car[,] put it in drive . . . and [ ] took off real fast." Defendant testified that he:

> swerved around this car, and [saw] people. [He saw] people everywhere. [He saw] them run out of the way, and [he] turned to avoid hitting [a] group of people on [his] left side. [He] turned, and [ ] turned, and [was] going straight [into a] tree, . . . [and] tried to go around it. [He] thought [he] hit a curb.

Defendant admitted he did not attempt to brake because when "you see something in front of you, you swerve. You don't hit your brakes." Defendant stated he did not know that he hit anyone with the Hummer. Defendant admitted he left the parking lot im-

mediately after hitting what he thought was the curb.

¶ 8 Cell phone records introduced at trial showed that, within minutes after leaving the parking lot, defendant and the other two occupants of the Hummer (Jason and Nicholas) began making and receiving numerous telephone calls, including several to and from defendant's girlfriend, who had been left behind at the bar, and "Joe," who later was picked up by defendant and directed defendant to a house where defendant purchased cocaine, which he and the other occupants of the vehicle then ingested. After the drug transaction, defendant noticed he was being followed by police. Defendant drove to his house and instructed Jason to move another vehicle out of the garage. Defendant then drove the Hummer into the garage, shut the garage door, and Jason parked the other vehicle in the driveway. Once inside, defendant called 9–1–1 and told the operator he "got jumped by a big group of people." He also stated he "didn't feel right," and that he had a headache and blood on his face.

¶ 9 After paramedics and police officers arrived at defendant's house, defendant told both a paramedic and a police officer that he did not remember anything that happened at the parking lot of the bar. However, at trial, the State played a recorded jail conversation between defendant and one of defendant's friends during its case-in-chief, in which defendant, referring to hitting J.P. with the Hummer, stated: "I remember everything. . . . I know everything that happened." When he testified, defendant admitted he had feigned his loss of memory because he "didn't want to tell [the police] I picked up cocaine. I didn't want to get anybody in trouble."

¶ 10 Jason, despite initially testifying that he did not lie to police about his recollection of what happened that night, conceded that he lied to police and he "wasn't accurate." Jason stated that although he "felt a bump," he thought it was a speed bump and did not realize defendant had hit someone with the Hummer. Jason admitted that the Hummer

---

**3.** Defendant later admitted on cross-examination that he heard someone make a "derogatory com-

ment" to him before the altercation occurred.

had bright lights and the parking lot was well lit. Jason further stated that he was going in and out of consciousness for the next several hours, he had difficulty remembering the events that had occurred that night, and that the police officers and paramedics "basically ignor[ed] [him] in this [compromised] condition."

¶ 11 Nicholas, the third occupant of the Hummer, testified that due to "self-medicat[ing]" for anxiety and "years of drug use," he had no memory of anything that happened the night of the incident after he exited the Hummer until he woke up the next morning at a friend's house.

¶ 12 Maricopa County medical examiner William Stano, M.D., testified that he performed an autopsy on J.P., which included an external and internal examination of his body. He stated that his primary duty as a medical examiner was to establish the cause and manner of death.[4] Dr. Stano concluded that the cause of J.P.'s death was blunt force trauma. He explained that there were five categories medical examiners use to define the manner of death: natural, homicide, suicide, accident, and undetermined. Dr. Stano determined that the manner of death was homicide based on his findings from the autopsy and the information he received from the police. He stated that he had to determine if the circumstances reported to him were consistent with the findings of the autopsy, and, in this case, he concluded the autopsy findings and the information provided by the police were consistent with homicide. Dr. Stano further said that although J.P. had alcohol in his system, it was unrelated to the cause and manner of death.

¶ 13 The jury was instructed it could find defendant not guilty or guilty of second degree murder, manslaughter, or negligent homicide. The jury found defendant guilty of second degree murder, a class 1 dangerous felony, and three counts of aggravated assault, class 3 dangerous felonies. The court sentenced defendant to 22 years for second degree murder, with 663 days of presentence

incarceration credit. Defendant also received concurrent 8.5 year sentences for each count of aggravated assault, to be served consecutively to count one.

¶ 14 Defendant timely appealed. We have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution, and Arizona Revised Statutes (A.R.S.) sections 12–120.21(A)(1) (2003), 13–4031, and –4033(A)(1) (2010).

## DISCUSSION

¶ 15 Defendant argues the court erred by allowing Dr. Stano to testify that the manner of J.P.'s death was homicide because Dr. Stano's opinion was not based on his medical examination of the body but rather he "parrot[ted]" the conclusions of the law enforcement investigation. We review the trial court's admission of expert testimony for an abuse of discretion. *State v. Davolt*, 207 Ariz. 191, 210, ¶ 69, 84 P.3d 456, 475 (2004).

¶ 16 We preliminarily note that it was not disputed at trial that defendant was driving the vehicle that struck J.P. Neither was there any question that J.P. died from blunt force trauma after being run over by the Hummer. The only matter for the jury to determine was whether defendant should be held criminally liable for J.P.'s death. During trial, the following exchange occurred when Dr. Stano was being questioned by the prosecutor:

Prosecutor: [A]fter you completed your autopsy examination and any other evaluation that you did of [J.P.] and the injuries he sustained, did you reach an opinion about the cause and manner of death?

Dr. Stano: Yes.

Prosecutor: Can you share those opinions with the jury now, please?

Dr. Stano: The cause of death was blunt force trauma. The manner of death was homicide.

After the prosecutor began her next question, defense counsel stated: "Objection, your honor." A bench conference then en-

---

4. Cause of death is "the disease or injury responsible for the lethal sequence of events." Harris County Institute of Forensic Sciences, *Cause and Manner of Death*, http://www.hcfx.net/ifs/cause. *aspx* (last accessed February 16, 2012). Manner of death "explains how the cause of death arose." *Id.*

sued during which defense counsel provided the basis for his objection: "That's a legal opinion. Homicide. He does not know if it was an accident or homicide. How can he give that opinion?" The trial court overruled the objection.

¶ 17 In Arizona, expert testimony is admissible if it "will assist the trier of fact to understand the evidence or determine a fact in issue." Ariz. R. Evid. 702. An expert may testify to an opinion that "embraces an ultimate issue to be decided by the trier of fact" if the testimony is otherwise admissible. Ariz. R. Evid. 704. The comment to Arizona Rules of Evidence (Rule) 704 cautions, however, that "[w]itnesses are not permitted as experts on how juries should decide cases." Finally, even relevant testimony that is admissible pursuant to Rule 702 "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *See* Ariz. R. Evid. 403; *see also State v. Chappell*, 225 Ariz. 229, 235–36, ¶ 17, 236 P.3d 1176, 1182–83 (2010).[5]

¶ 18 Citing *State v. Gillies*, 135 Ariz. 500, 509, 662 P.2d 1007, 1016 (1983), the State claims that medical examiners are permitted to testify regarding the manner of death even if such testimony goes to the ultimate issue in the case. This is true to a point. As recognized in *Gillies*, and as noted above, Rule 704 does not prohibit an expert from testifying in the form of an opinion embracing the ultimate issue if the opinion is otherwise admissible. In *Gillies*, in which it was obvious that the victim was murdered,[6] the court concluded that "overwhelming evidence that the victim was murdered dispel[led] any chance that the jury was unfairly prejudiced by the testimony in question." *Id.* Thus, the

holding in *Gillies* was limited to the observation that the medical examiner's testimony was not *inadmissible* under Rule 403; it does not stand for the proposition that the rules of evidence invariably permit a medical examiner to testify to the manner of death in a murder case.

¶ 19 The State also argues that Dr. Stano was only stating his opinion "regarding the cause and manner of death from a medical perspective, not in the context of whether [defendant] committed a criminal offense." We cannot say how Dr. Stano intended his testimony to be understood. But we are less concerned with his intended meaning than with the manner in which his testimony would be understood by a typical juror. The initial question then is whether his opinion would assist the jury in understanding the evidence or determining a fact in issue. *See* Ariz. R. Evid. 702.

¶ 20 As previously mentioned, Dr. Stano's testimony that the victim died as the result of a "homicide" went to the key issue in the case: Did defendant intentionally, knowingly or recklessly cause the victim's death by a criminal act or was the victim's death the result of a non-criminal accident? Although it is not accurate, as argued by defendant, to characterize Dr. Stano's testimony as merely "parroting" the results of the police investigation, it does not appear that Dr. Stano relied on any "specialized knowledge" to classify the death as a "homicide" rather than an "accident." Under cross-examination, Dr. Stano agreed with defense counsel that he based his conclusion that the death was a homicide on the circumstances reported to him by the police. Indeed, Dr. Stano was in no better position to determine the manner of death than was the jury who heard the

5. To be raised as error on appeal, a ruling admitting evidence must be objected to in a timely manner. Ariz. R. Evid. 103(A)(1); *see also Azbill v. State*, 19 Ariz. 499, 501, 172 P. 658, 659 (1918) (an objection made after an answer is given is "too late"). Although it appears that the objection may have been "too late," the State has not claimed on appeal that defendant's objection was untimely. At oral argument, the State asserted for the first time on appeal that the objection was deficient pursuant to Rule 103 because it failed to "stat[e] the specific ground of objection." We do not consider claims made for the first time at

oral argument. *See Mitchell v. Gamble*, 207 Ariz. 364, 369–70, ¶ 16, 86 P.3d 944, 949–50 (App. 2004). In any event, even though defense counsel did not cite a specific rule of evidence as the basis for his objection, the nature of the objection was sufficient to alert the trial court that defendant was relying on Rules 702 and 704.

6. The victim was repeatedly raped, pushed off a cliff, bashed on the head with rocks until she lost consciousness, and then covered with rocks. *Id.* at 505, 662 P.2d at 1012.

actual trial testimony of witnesses and had the opportunity to evaluate their credibility.

¶ 21 As have courts in other jurisdictions under similar circumstances, we conclude that the medical examiner's testimony was not admissible pursuant to Rule 702.[7] *See, e.g., State v. Vining,* 645 A.2d 20, 21 (Me. 1994) (determining that medical examiner's testimony that victim's death was a homicide and not an accident was erroneously admitted: "Her opinion was based solely on her discussions with the police investigators and therefore amounted to an assessment of the credibility and investigatory acumen of the police."); *State v. Jamerson,* 153 N.J. 318, 708 A.2d 1183, 1195 (1998) (holding that the medical examiner "should not have been permitted to testify that this was a reckless homicide rather than an accidental killing" because "there were circumstances leading up to the accident that were within the understanding of the average juror"); *Bond v. Commonwealth,* 226 Va. 534, 311 S.E.2d 769, 772 (1984) (concluding that the medical examiner's testimony was inadmissible: "The ultimate question was whether the decedent jumped intentionally, fell accidentally, or was thrown to her death. The facts and circumstances shown by the testimony of lay witnesses were sufficient to enable a jury to decide that question. The expert's opinion was based largely, if not entirely, upon the same facts and circumstances.").

¶ 22 The State nonetheless relies on other out-of-state cases that permit a medical examiner to testify in a criminal case that the manner of death was homicide. We are not persuaded. For example, in *People v. Perry,* 229 Ill.App.3d 29, 170 Ill.Dec. 823, 593 N.E.2d 712, 716 (1992), the court stated: "[The pathologist's] opinion as to homicide, caused by the defendant's body being positioned on top of her sleeping son, did not in any way add to the evidence already presented to the jury or assist them in reaching their own conclusions." The court, however, upheld the defendant's conviction for involun-

tary manslaughter in light of the overwhelming evidence of her guilt. *Id.,* 170 Ill.Dec. 823, 593 N.E.2d at 717. *Perry* therefore is consistent with the cases we cited above as supporting our determination that Dr. Stano should not have been permitted to testify as to the manner of death. In *State v. Bradford,* 618 N.W.2d 782, 793 (Minn.2000), the court held that the testimony by a pathologist that the victim's death was a homicide was admissible because the pathologist's specialized knowledge assisted the jury in distinguishing between a self-inflicted intraoral gunshot wound and one inflicted by another person. *Bradford,* however, is inapposite because the pathologist's opinion that the death was a homicide rather than suicide appears to have been based on his external and internal examination of the victim rather than a history provided to him by law enforcement investigators. Likewise, in *Smith v. State,* 276 Ga. 97, 575 S.E.2d 450, 453 (2003), the pathologist based his opinion that the death was a homicide "on the appearance of the wound, the path and course of the bullet, the presence of a laceration to the head of the victim, and the absence of a gun at the scene." To the extent that there is a common thread amongst these cases, it is that the admissibility in a criminal case of a medical examiner's opinion regarding the manner of death depends on the particular facts and circumstances of each case.

¶ 23 Perhaps the strongest case supporting the State's argument is *State v. Commander,* 396 S.C. 254, 721 S.E.2d 413 (2011), which involved a victim whose mummified and partially decomposed body was found covered by a blanket and lying on a sofa inside her home. Although the autopsy did not uncover any evidence of violence or trauma to the victim's body, the medical examiner, relying on anecdotal evidence provided by officers at the scene and the absence of the normal indicators of physical violence, opined that the cause of death was asphyxiation and that the manner of death was homicide due to "suspicious circumstances." *Id.* at 415.[8]

---

7. We recognize that medical examiners are required to "[c]ertify to the cause and manner of death following completion of the death investigation[.]" A.R.S. § 11–594(A)(2) (Supp.2011).

Our opinion does not affect a medical examiner's statutory duty to make such certification.

8. The medical examiner identified the following "extremely suspicious circumstances" based on

Noting that the anecdotal history relied on by the medical examiner was the type of information routinely relied on by medical professionals in conducting autopsies, *id.* at 419, the court concluded that the trial court did not abuse its discretion in admitting the medical examiner's opinion that the victim's death was a homicide. *Id.* at 421.

■ ¶ 24 We do not disagree with the result reached in *Commander.* Neither do we find it inconsistent with the result we reach. The history relied on by the pathologist in *Commander,* which consisted of objectively verifiable data, was, as the court noted, "of a type reasonably relied upon by experts" in determining the cause and manner of death. *See* Rule 703. Insofar as the record suggests here, however, the history relied on by Dr. Stano was comprised of the statements by, for the most part, interested witnesses whose accuracy and credibility were necessarily subject to question. Indeed, had the court in *Commander* been faced with circumstances similar to those in this case, it may well have reached a different result.[9]

■ ¶ 25 Moreover, even if the testimony was otherwise admissible, it was apt to mislead or confuse the jury and should have been excluded under Rule 403. *See Perry,* 170 Ill.Dec. 823, 593 N.E.2d at 716 (observing that pathologist's testimony that child's death was a homicide "might be construed as prejudicial, since a layperson might equate the word homicide with murder"); *Jamerson,* 708 A.2d at 1195 (permitting medical examiner to testify that crash was a homicide "tends to mislead the jury into thinking that [the medical examiner] knows something that they do not know"). Even if Dr. Stano, as the State contends, was only intending to convey his *medical* opinion rather than make a statement regarding criminal causality, no such distinction was brought out in his testimony. Defendant argues, and we agree, that jurors may have understood Dr. Stano's opinion to be that defendant was guilty of the criminal offense of homicide.[10] Although an expert's opinion may "embrace" an ultimate issue under Rule 704, an expert is not permitted to tell a jury how to decide a case.[11]

■ ¶ 26 To summarize, we are not able to formulate a bright-line rule that will govern every scenario in which a medical examiner may be asked to testify regarding the victim's manner of death in a criminal case over a defendant's objection. Instead, the trial court, in evaluating whether the expert testimony will satisfy the requirements of Rule 702 and, if so, whether it should nonetheless be precluded pursuant to Rule 403, should consider the extent to which the medical examiner's opinion assists the jury in interpreting and/or understanding the circumstances of the victim's death. For example, when, as here, the medical examiner's opinion regarding the manner of death is

the history given him: "she was already in her house, her car was missing, her purse was missing, there was some indication that somebody was sending text messages [from the victim's mobile telephone] to family members indicating that the dead woman ... was still alive[.]" *Id.* at 415.

9. The defendant in *Commander* argued that the province of the jury is invaded and "[t]he line crossed where the physician gives an opinion outside of his medical expertise where he is in reality only enhancing the circumstantial evidence available to the jury with the prestige of a forensic pathologist." *Id.* at 420. In response, the court stated: "While we agree with the spirit of [the defendant's] argument, no such line was crossed in this case." *Id.* That line was crossed here.

10. In Arizona, a "homicide" means first degree murder, second degree murder, manslaughter, or negligent homicide. A.R.S. § 13–1101(2) (2010).

11. In several other cases relied on by the State, the medical examiner's testimony was limited to medical and not legal causation. *See Sippio v. State,* 350 Md. 633, 714 A.2d 864, 873–74 (1998) (medical examiner testified that he could not consider intent of person who pulled trigger because that was a legal conclusion); *Commonwealth v. Daniels,* 480 Pa. 340, 390 A.2d 172, 178–79 (1978) (trial court explained to jury at conclusion of medical examiner's testimony that homicide was a "neutral" term); *State v. Scott,* 206 W.Va. 158, 522 S.E.2d 626, 631 (1999) (although medical examiner testified that manner of death was homicide, he clarified that he was not making a legal conclusion and he was not qualified to determine whether death was first degree murder, manslaughter, voluntary or involuntary); *State v. Tucker,* 96 P.3d 368, 370 (Utah App.2004) (medical examiner classified victim's manner of death as homicide, but testified intent was not element he considered in determining classification).

based largely on the testimony of lay witnesses whose credibility the jury can determine without the aid of expert testimony, an expert's opinion regarding the manner of death would normally be inadmissible. On the other hand, a medical examiner's testimony regarding the manner of death that is based primarily on the expert's external and internal examination of the body will frequently assist the jury in understanding the evidence and would ordinarily be admissible. The admissibility of such testimony is less clear when the medical examiner's opinion is based partly on anecdotal information regarding the circumstances surrounding the victim's death as relayed by law enforcement officers or from other sources. In such cases, it would depend to a large degree on whether "experts in the [forensic pathology] field would reasonably rely on those kinds of facts or data in forming an opinion on the subject[.]" *See* Rule 703. Finally, if such testimony is admitted, the trial court should consider giving a limiting or clarifying instruction, as suggested by some of the cases discussed above, when necessary to avoid unfair prejudice or confusion.[12]

■ ¶ 27 Even though we have concluded that the medical examiner's testimony was erroneously admitted, we will nonetheless affirm the verdict if the error was harmless. *State v. Bible*, 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993). Error is harmless "if the state in light of all of the evidence, can establish beyond a reasonable doubt, that the error did not contribute to or affect the verdict." *See State v. Valverde*, 220 Ariz. 582, 585, ¶ 11, 208 P.3d 233, 236 (2009) (citation and internal quotation omitted).

■ ¶ 28 Here, applying this standard, the error was harmless. Defendant was visibly

angry after a physical altercation with J.P. Defendant then got in the vehicle and drove it out of the direct line of sight of the victims and returned shortly thereafter. Multiple witnesses saw defendant drive "as fast as [he] could," with the engine "rev[ved]," hit J.P. from behind, and "[throw] him forward." Defendant admitted he saw people in front of him, but did not attempt to brake before he struck and fatally injured J.P. with the vehicle; neither did he remain at the scene and attempt to render aid. Instead, defendant, who testified that he believed he had run over a curb, left the parking lot with his friends and proceeded to purchase and use cocaine before returning to his residence. Although he initially told a paramedic and a police officer that he did not remember what happened that evening after he hit his head on the pavement, after the jail audiotape of his statement that he "remembered everything ... that happened" was played for the jury, he admitted his initial statements were untruthful. The evidence that defendant intentionally aimed his vehicle at the group of persons—including J.P.—with whom he had the altercation, is extremely strong. Moreover, defendant's explanation that he was still dazed as a result of the fight, when coupled with his subsequent actions, is not plausible. *See State v. Gamble*, 146 Idaho 331, 193 P.3d 878, 889 (Idaho App.2008) (concluding that error was harmless because the evidence was overwhelming and defendant "presented virtually no plausible defense"). Finally, Dr. Stano's testimony occupied only a brief portion of the trial and his opinion that the manner of death was homicide was not thereafter mentioned by either party. Under these circumstances, we conclude that the jury verdicts were "surely unattributa-

12. Various amendments to the Arizona Rules of Evidence became effective January 1, 2012. The majority of the amendments involve "restyling" changes so that the Arizona rules correspond to the language in the Federal Rules of Evidence and are not meant to change the admissibility of

evidence. *See* Prefatory Comment to 2012 Amendments. Several rules, however, including Rule 702, have been amended to "conform" to the federal rules, and the changes may substantively alter the standard for determining the admissibility of evidence. *Id.*

ble" to the error and that Dr. Stano's testimony was therefore harmless beyond a reasonable doubt. *See Valverde*, 220 Ariz. at 585, ¶ 11, 208 P.3d at 236.

## CONCLUSION

¶ 29 For the foregoing reasons, we affirm.

CONCURRING: MICHAEL J. BROWN, Presiding Judge and PATRICIA K. NORRIS, Judge.