# IN THE COURT OF APPEALS OF IOWA

No. 13-0588
Filed June 11, 2014

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**HILLARY TYLER,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Webster County, Thomas J. Bice, Judge.

Hillary Tyler appeals her conviction for second-degree murder, challenging the district court's denial of her motion in limine concerning the medical examiner's opinion of the victim's cause and manner of death. **REVERSED AND REMANDED FOR A NEW TRIAL.**

Mark C. Smith, State Appellate Defender, and Maria Ruhtenberg, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Tyler J. Buller and Laura Roan, Assistant Attorneys General, Ricki L. Osborn, County Attorney, and Cori Kuhn Coleman, Assistant County Attorney, for appellee.

Heard by Doyle, P.J., and Mullins, J., and Mahan, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2013).

**DOYLE, P.J.**

Hillary Tyler appeals her conviction for second-degree murder for the death of her newborn son. She contends the district court erred in denying several of her trial motions, including her motion in limine that sought to exclude the State from soliciting testimony from the medical examiner on his opinion of the cause and manner of the victim's death. Tyler asserts the doctor's opinion, based solely upon Tyler's statements to law enforcement officers and not his medical expertise, invaded the province of the jury to decide credibility and factual issues. Because we agree with Tyler, we reverse her conviction and remand for a new trial.

### I. Background Facts and Proceedings.

From the evidence presented at trial, the jury could have found the following relevant facts. In early 2011, Hillary Tyler became pregnant with her boyfriend's child. As time progressed, Tyler began showing, but she denied she was pregnant to those who inquired. On September 19, 2011, Tyler, unbeknownst to others, gave birth to a baby boy in a hotel room. Sometime after giving birth, she placed the baby, who was deceased at that time, in the trashcan of the hotel room, and she left the hotel.

The hotel's staff found blood in Tyler's room the next day and contacted law enforcement officers. Officers searched the room and discovered the baby in the trashcan. The officers learned Tyler was the prior occupant of the room and went to her home. She was ultimately taken to the police station and interviewed.

Tyler's three-hour interview was video recorded. She initially told the officers that after she gave birth to the baby, he made no sounds and did not move, and she immediately placed him in the trashcan. Later in the interview, after an officer asked Tyler hypothetical questions about what the baby's autopsy would show, Tyler's story changed. Tyler stated the baby had moved and cried after she gave birth. She stated she then put the baby in the bathtub face down, and she filled the tub with enough water to drown the baby. She told the officer she later put her deceased child in the trashcan and left the hotel.

After her interview, Tyler was transported to the emergency room of a local hospital where she was examined and admitted. The next day, officers went to Tyler's hospital room for a follow-up interview, which was audio recorded, and the officers discussed with Tyler her prior statements. Tyler stated she knew the baby would drown when she put the baby in the tub face down in the water.

An autopsy was performed on the baby by the Associate State Medical Examiner (ME), and the ME issued a report. The ME opined in his report that the infant "died of bathtub drowning." The report stated:

> According to investigative reports, the decedent was found dead in a trash receptacle at a motel . . . . The mother claimed she had given birth the previous day in the motel room and then placed the infant in a bathtub partially filled with water shortly after the birth. The baby reportedly moved and cried after birth.

The ME opined the manner of the infant's death was homicide.

Tyler was charged with first-degree murder for the baby's death, and Tyler entered a plea of not guilty. Prior to trial, the ME was deposed by Tyler. There, the ME testified that prior to issuing his autopsy report in the case, he watched Tyler's video-recorded interview. Based upon Tyler's statements in the video, he

concluded the baby's cause of death was drowning and the manner of death was homicide. The doctor explained that in listening to a witness's statement, "you always consider whether the witness statement—whether you feel they can be truthful or whether you feel that they are making something up." He testified that "everything that was stated within [Tyler's] statement [was] consistent with the autopsy, so in my opinion, I felt [Tyler] was being truthful." Nevertheless, he conceded that, based on the autopsy alone, there was no way medically or scientifically he could give an opinion or conclusion as to whether the baby was born alive. He also testified that, based only on his autopsy findings, he could not say the baby drowned nor could he say the baby ever took a breath.

Based upon the ME's report and his deposition testimony, Tyler filed a motion in limine requesting, among other things, the State be prohibited

> from soliciting or introducing any evidence from the [ME] as to scientific or medical opinions on the cause or manner of death in this case and his conclusion the death was a "homicide." Any testimony from the [ME] related to these topics would not be based on any scientific or medical knowledge, scientific standards, or technical training, but merely from the witness adopting the statements and conclusions of law enforcement.

Essentially, Tyler argued the medical examiner's anticipated testimony that the infant's death was a homicide was based upon his belief Tyler was truthful in her interview, not his medical expertise, and that "allowing the [ME] to so opine allowed him to address the credibility of [Tyler] and her statement," which was the province of the jury. The State resisted, and following a hearing, the court overruled her motion.

A jury trial commenced in February 2013. Tyler's presented defense was essentially that her statements to law enforcement officers about drowning the

baby were not truthful and the result of coercion combined with her need for medical care. Her emphasis was on the fact it was medically impossible to show the baby drown, while the evidence did demonstrate it was possible the baby was stillborn or died immediately after birth. Tyler's credibility was the central issue of the case.

The ME testified on behalf of the State, and he testified that after he reviewed the related case history, scene findings, and witness statements, including Tyler's statements to the officers, his opinion was that the baby's cause of death was drowning. For those same reasons, he opined that the manner of the baby's death was homicide. He noted the baby "had several regions where the lungs were still collapsed and then focal regions where . . . the alveolar spaces were expanded," and he opined, "[g]iven the history that [the baby] cried and moved, to me that suggests that [the baby] probably took a few breaths." However, he admitted that the autopsy findings alone, by themselves, did not medically or scientifically support a finding of drowning as the cause of death.

After hearing all the evidence, including the video and audio recordings of her interviews, the jury found Tyler guilty of the lesser-included offense of second-degree murder, in violation of Iowa Code sections 707.1 and .3 (2011). After the denial of her posttrial motions, including motions for a new trial, Tyler was sentenced to an indeterminate term not to exceed fifty years.

Tyler now appeals, contending the court erred in denying several of her motions. Among other things, she contends the ME's opinion testimony amounted to inadmissible evidence concerning the credibility of her statements

to police. Because we find her argument concerning the medical examiner's opinion testimony to be dispositive, we need not address her other claims.

## II. Scope and Standards of Review.

Evidentiary rulings, such as rulings on motions in limine, are reviewed for an abuse of discretion. *State v. Eliott*, 806 N.W.2d 660, 667 (Iowa 2011). "An abuse of discretion occurs when the district court exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State v. Miller*, 841 N.W.2d 583, 586 (Iowa 2014) (internal citations and quotation marks omitted). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *State v. Redmond*, 803 N.W.2d 112, 117 (Iowa 2011) (internal citations and quotation marks omitted).

## III. Discussion.

## A. ME's Opinion Testimony.

Iowa is committed to a liberal view on the admissibility of expert testimony, and this court is deferential to the discretion of the district court in this area. *See Leaf v. Goodyear Tire & Rubber Co.*, 590 N.W.2d 525, 531 (Iowa 1999). "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Iowa R. Evid. 5.702. However, "[e]xpert testimony directly expressing an opinion on the credibility of a witness is not admissible." *State v. Allen*, 565 N.W.2d 333, 338 (Iowa 1997). "'There is a fine but essential line between testimony that is helpful to the jury and an opinion that

merely conveys a conclusion concerning the defendant's guilt.'"  *Id.* (quoting *State v. Pansegrau*, 524 N.W.2d 207, 210 (Iowa Ct. App. 1994)).

Whether a pathologist's testimony concerning the cause and manner of death is admissible over an objection that the testimony is not based on the medical examination of the victim but rather on witness statements appears to be an issue of first impression in Iowa.  Nevertheless, this issue is not unique, and both parties rely on a number of cases from other jurisdictions in arguing their respective positions.  *See generally State v. Sosnowicz*, 270 P.3d 917, 922-24 (Ariz. Ct. App. 2012) (and cases collected therein); *Baraka v. Commonwealth*, 194 S.W.3d 313, 318 (Ky. 2006) (same).  For example, in *State v. Commander*, 721 S.E.2d 413, 415 (S.C. 2011), the pathologist in that case

> testified the autopsy did not uncover any evidence of violence or trauma to [the v]ictim's body or any other evidence of injury.  A later toxicology report was similarly indefinite.  However, using the anecdotal history relayed by officers at the scene, together with the lack of normal indicators of physical violence, [the pathologist] opined that the cause of death was asphyxiation, which would not leave physical marks, and that the manner of death was homicide due to the suspicious nature of [the v]ictim's death.

Although the South Carolina Supreme Court ultimately concluded that any error as to the pathologist's testimony was harmless, the court chose to address the expert-testimony issue anyway.  *See Commander*, 721 S.E.2d at 418.  The court found that, "[b]ecause the anecdotal history is an essential component of any autopsy," the pathologist's "testimony concerning findings based on this information falls within the umbrella of the expert's specialized knowledge."  *Id.* at 419-20.  Under the facts of that case, the court determined "[t]he information

gleaned from the police investigation formed merely one aspect of [the pathologist's] examination." *Id.* at 420. Nevertheless, the court recognized

> that, in certain circumstances, expert medical testimony of this type has the potential to invade the province of the jury. [Commander] urges that "[t]he line is crossed where the physician gives an opinion outside of his medical expertise where he is in reality only enhancing the circumstantial evidence available to the jury with the prestige of a forensic pathologist." While we agree with the spirit of [Commander's] contention, no such line was crossed in this case.

*Id.* (internal citations omitted).

The Arizona Court of Appeals was recently presented with this issue, and under the facts of its case, it determined the pathologist's testimony was inadmissible, "[a]s have courts in other jurisdictions under similar circumstances." *Sosnowicz*, 270 P.3d at 922-23. The court explained that, in its case,

> it does not appear that [the pathologist] relied on any "specialized knowledge" to classify the death as a "homicide" rather than an "accident." Under cross-examination, [the pathologist] agreed with defense counsel that he based his conclusion that the death was a homicide on the circumstances reported to him by the police. Indeed, [the pathologist] was in no better position to determine the manner of death than was the jury who heard the actual trial testimony of witnesses and had the opportunity to evaluate their credibility.

*Id.* The court recognized an opposite result was reached in *Commander*, but it noted that it did not disagree with the result reached in *Commander*, nor did it find *Commander* inconsistent with the result it reached. *Id.* at 924. The court observed that

> [t]he history relied on by the pathologist in *Commander*, which consisted of objectively verifiable data, was, as the court noted, "of a type reasonably relied upon by experts" in determining the cause and manner of death. . . . Insofar as the record suggests here, however, the history relied on by [the pathologist in this case] was comprised of the statements by, for the most part, interested witnesses whose accuracy and credibility were necessarily subject

to question. Indeed, had the court in *Commander* been faced with circumstances similar to those in this case, it may well have reached a different result.

*Id.* Nevertheless, that court did not reverse on the issue, finding the admission of the testimony was harmless under the facts of that case. *Id.* at 926.

Another court, in summarizing the state of the law on this subject, observed that the consensus seemed to be

> that an expert [pathologist] or forensic pathologist can express an opinion not only as to the cause of death, but also that the manner of death was homicide, i.e., by the act or omission of another person, *where such would not be readily ascertainable by a layperson, thus would assist that trier of fact in determining a fact in issue.* However, the expert cannot express an opinion as to the mental state of the accused which would constitute an expression as to guilt or innocence, *and cannot base the opinion solely on facts that are just as easily understood by a layperson.*

*Baraka*, 194 S.W.3d at 318 (emphasis added).

In the present case, the district court permitted the State to solicit the ME's opinion testimony, concluding:

> The ME bases his opinion on the autopsy performed upon the deceased infant coupled with a direct statement coming from [Tyler] that strongly suggests a live birth. Such reliance is permissible as this is no different than a physician relying on a patient's history in reaching a diagnosis. Further, here . . . the statement relied upon that formulates a part of the basis for reaching a learned, expert opinion comes directly from [Tyler] and not the "investigatory acumen of police." Further, generally, questions of medical causation normally require expert testimony. . . .
>
> Further, as indicated by the Iowa case law, "we reiterate, the weight to be given an expert's opinion is for the trier of fact." *See Lithcote v. Ballenger*, 471 N.W.2d 64, 66 (Iowa Ct. App. 1991). In addition, "[a]n expert's lack of absolute certainty goes to the weight of this testimony, not to its admissibility." *See Williams v. Hedican*, 561 N.W.2d 817, 823 (Iowa 1997). Also, in Iowa, the courts are committed to a liberal rule on the admission of expert testimony. *See DeBurkarte v. Louvar*, 393 N.W.2d 131, 138 (Iowa 1973).
>
> Here, the issue is whether there was a "live birth" and the cause and method of death are questions of fact. The jury, and not

this court, will be the one to decide these issues. Accordingly, [Tyler's] motion in limine as it attempts to limit the testimony and opinions of the [ME] is overruled, subject to [Tyler's] right to vigorously and thoroughly cross-examine.

We respectfully disagree.

Here, it is true the ME based his opinion on Tyler's direct statements and not the opinions of the officers in the case. Nevertheless, Tyler's defense was that her statements to the officers were the products of coercion along with her lack of medical care. The veracity of Tyler's statements were the very issue before the jury. Without her statements, the ME testified that he would not be able to give any opinion as to the infant's cause and manner of death. Permitting the ME to give his opinion, based only on Tyler's statements and not his medical expertise, allowed him to provide the jury his opinion of Tyler's credibility. This crossed the very fine line into impermissible expert testimony.

Although the district court attempted to distinguish this case from *State v. Vining*, 645 A.2d 20 (Me. 1994), we find the analysis and result in that case to be spot-on.[1] In *Vining*, a pathologist was permitted to testify at trial that her opinion was that the victim's death was a homicide. 645 A.2d at 20. However, the doctor based her opinion "solely on her discussions with the police investigators," not her medical expertise. *Id.* at 21. The Supreme Judicial Court of Maine reversed Vining's conviction, concluding the pathologist's opinion "amounted to

---

[1] Although the State asserts *Vining* is not good law, *Vining* was merely distinguished in *Rollins v. State*, 897 A.2d 821, 852 (Md. 2006): "Two cases that [Rollins] cites, [including] *State v. Vining*, 645 A.2d 20 (Me. 1994) . . . are distinguishable from the present case. In both [cases], the [pathologists] based their opinions on the respective causes of death of the victims solely on information given to them by police detectives." *Rollins* has since been abrogated on other grounds. *See Derr v. State*, 29 A.3d 533, 549 (Md. 2011) *cert. granted, judgment vacated*.

an assessment of the credibility and investigatory acumen of the police," which was within "the exclusive province of the jury." *Id.* The court explained:

> It is appropriate for the [pathologist] to testify, as she did, that the damage to the [victim's] skull shows that severe force was applied. It is another thing entirely, however, to testify that although the physical evidence was insufficient for her to distinguish whether [the victim] fell or was pushed, the police investigators have convinced her that Eaton's death was a homicide. That is not an expert medical opinion.

*Id.* The same is true here; only in this case, the ME was essentially permitted to testify he believed Tyler's statements, and therefore, the cause of the baby's death was drowning, and the manner of death was a homicide. Without his reliance upon her statements, he admitted he could not medically or scientifically opine whether the baby died in utero, immediately after its birth, or later via drowning. The ME's opinion was simply not an expert medical opinion, and his opinion could not be of assistance to the jury under the limited facts of this case. As another court explained:

> An expert witness should distinguish between what he knows as an expert and what he may believe as a layman. His role is to contribute the insight of his specialty. He is not an advocate; that is the role of counsel. Nor is he the ultimate trier of the facts; that is the role of the jury or the judge, as the case may be. The trier of the facts may be misled if the expert goes beyond what he can contribute as an expert.

*State v. Jamerson*, 708 A.2d 1183, 1194-95 (N.J. 1998) (citation omitted). Moreover, his opinion could "mislead the jury into thinking that he knows something that they do not know." *See id.* at 1195. The jury in this case was as competent as the ME to analyze the facts and determine whether the baby died as a result of natural causes versus Tyler's actions. *See, e.g., Stringer v. Commonwealth*, 956 S.W.2d 883, 889-90 (Ky. 1997) ("Presumably, jurors do not

need assistance in the form of an expert's opinion that the defendant is guilty or not guilty."). The ME's opinion as to the infant's cause and manner of death should have been excluded, and the district court abused its discretion in allowing the opinion into evidence.

### B. Error.

"A trial court's erroneous admission of evidence is only reversed on appeal if a substantial right of the party is affected." *Redmond*, 803 N.W.2d at 127 (citation and quotation marks omitted). If evidence is admitted erroneously but does not cause the defendant prejudice, the evidence's admission is deemed harmless and reversal is not warranted. *Id.* However, if the evidence's admission causes the party to be "injuriously affected by the error" or to suffer "a miscarriage of justice," the non-constitutional error is not harmless, and the case must be reversed. *Id.*

We adhere to the view that error in the admission of expert opinion may be harmless when other evidence of guilt is overwhelming. *See id.* This is not that type of case. Aside from Tyler's statements, there was little corroborating evidence in the case. Here, we believe the expert's opinion, recorded in his report and reaffirmed in his oral testimony, may have been the decisive factor in the jury's finding that the baby's death was the result of Tyler's action. Error was not harmless in this case.

### IV. Conclusion.

For the foregoing reasons, we reverse Tyler's conviction for second-degree murder, and we remand the case for a new trial.

**REVERSED AND REMANDED FOR NEW TRIAL.**