NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE
# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

GARY AUSTIN WORRELL, *Appellant*.

No. 1 CA-CR 19-0546
FILED 12-31-2020

Appeal from the Superior Court in Yavapai County
No. P1300CR201701536
The Honorable Tina R. Ainley, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Alice Jones
*Counsel for Appellee*

Jones Skelton & Hochuli PLC, Phoenix
By Lori L. Voepel
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

---

Presiding Judge Jennifer M. Perkins delivered the decision of the Court, in which Judge David B. Gass and Judge Michael J. Brown joined.

---

**P E R K I N S**, Judge:

¶1 Gary Austin Worrell appeals his convictions and sentences for two counts of child abuse, one committed "intentionally or knowingly" and the other committed "recklessly." For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Worrell and his wife, H.W., brought their son, C.W., who was one week shy of five months old, to a hospital emergency room because his upper right arm was swollen and obviously causing him pain. Hospital personnel took four x-rays, which revealed a recent fracture of C.W.'s right humerus, clean through the bone, and healed fractures—approximately six to eight weeks old—of several ribs and left forearm. The x-rays revealed no fractures in C.W.'s lower body. The emergency room doctor who examined C.W. suspected all the fractures resulted from "child abuse" because the injuries occurred at different times, C.W. was "nonambulatory," and no alternative explanation for the fractures was evident. The Department of Child Safety ("DCS") and law enforcement launched an investigation.

¶3 A detective questioned Worrell and H.W. separately at the hospital. After initially denying any knowledge of how C.W. was injured, Worrell admitted that the previous night, when C.W. kept removing his pacifier and "just wouldn't stop" crying, Worrell pushed his arm down and heard a "pop." Worrell also recalled that C.W.'s ribs and left forearm were "tender" approximately two months earlier, and he acknowledged he might have caused those injuries when he "pulled" C.W. down from his changing table to the ground.

¶4 H.W. was unaware of Worrell's actions. He previously told her C.W. rolled off the changing table, and he hid the extent of C.W.'s injuries at that time. Worrell pretended to discover C.W.'s upper arm injury the morning they brought him to the hospital. Worrell suggested they go to the hospital because he "knew" he "messed up."

¶5 The State charged Worrell with two counts of child abuse committed intentionally or knowingly—Count 1 relating to the earlier rib and forearm injuries and Count 2 pertaining to the later humerus fracture. DCS removed C.W. from his parents' custody at the hospital and placed him with a foster family, where he remained for approximately ten months. When the foster family received C.W., he was unable to crawl or fully roll over. He suffered no additional fractures and exhibited no atypical medical conditions while in their custody.

¶6 Approximately three weeks after the hospital visit, and after Worrell's indictment for the above charges, a nurse practitioner specializing in potential child abuse cases reviewed C.W.'s hospital records. The nurse practitioner conducted a more comprehensive medical evaluation of C.W., including a "skeletal survey" consisting of twenty-one x-rays. The x-rays revealed two additional fractures—one of a metatarsal bone in C.W.'s right foot and another of the tibia bone in his left leg. The nurse practitioner estimated the injuries occurred "at least 10 to 14 days" before the x-rays were taken. C.W. also underwent laboratory tests to determine whether an underlying medical condition or deficiency rendered his bones abnormally susceptible to fractures. C.W.'s lab results came back normal. After an evidentiary hearing, the superior court granted the State's motion to present evidence of C.W.'s metatarsal and tibia fractures at trial under Arizona Rule of Evidence 404(b).

¶7 At Worrell's trial, the State presented three expert medical witnesses. The jury heard testimony from the emergency room doctor and nurse practitioner, who evaluated C.W. in person, and a pediatric child abuse specialist, who reviewed C.W.'s records and relevant police reports. All three expert medical witnesses agreed C.W.'s injuries were consistent with child abuse or nonaccidental trauma; C.W. suffered multiple fractures at different times, he was unable to roll over or crawl when he was injured, and no alternative medical reason explained the injuries.

¶8 Worrell did not offer any competing medical evidence in his defense, but he suggested C.W.'s injuries could have resulted from an undiagnosed vitamin deficiency and argued his confessions were falsely made. Worrell's sole expert witness was a professor who studied false confessions and who testified that the detective's interrogation of Worrell in this case incorporated a number of tactics associated with a higher risk of eliciting false confessions. Worrell also argued that even if jurors believed he caused C.W.'s fractures, the evidence did not show he did so intentionally or knowingly.

**¶9** The jury found Worrell guilty of (1) child abuse committed intentionally or knowingly for C.W.'s broken humerus in his upper right arm, and (2) the lesser-included offense of child abuse committed recklessly for the injuries to C.W.'s ribs and left forearm. After the State presented evidence in an aggravation phase, jurors found (1) C.W. suffered physical harm, and (2) Worrell was on probation at the time of the offenses.

**¶10** Taking into account the prior convictions for which Worrell was serving probation, the superior court sentenced him as a repetitive offender to concurrent, somewhat aggravated prison terms of twelve and six years for the two child abuse convictions. Worrell timely appealed.

## DISCUSSION

### I. Admission of Uncharged Other Acts

**¶11** Worrell contends the superior court improperly admitted the "other acts" evidence of C.W.'s broken metatarsal and tibia bones. Although "evidence of other crimes, wrongs, or acts" is generally inadmissible "to prove the character of a person in order to show action in conformity therewith," such evidence may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ariz. R. Evid. 404(b). We review the superior court's admission of other acts evidence for an abuse of discretion. *State v. Hausner*, 230 Ariz. 60, 78, ¶ 68 (2012).

**¶12** To admit other act evidence under Rule 404(b), the State "must prove by clear and convincing evidence that the defendant committed the other acts; they must be offered for a proper purpose; they must be relevant; and, consistent with Rule 403, their probative value must not be substantially outweighed by the danger of unfair prejudice." *Id.* at ¶ 69. Here, Worrell asserts (1) the superior court prejudicially erred because it did not specifically find he caused the other fractures by clear and convincing evidence; (2) no clear and convincing evidence showed Worrell caused the other fractures; and (3) the probative value of the evidence was substantially outweighed by the risk of unfair prejudice.

**¶13** Contrary to Worrell's contention, the superior court does not have to make an explicit finding by clear and convincing evidence that the defendant committed a prior act when determining admissibility under Rule 404(b). Although a specific finding is not required, the best practice for the superior court is to make a specific finding on the record that clear and convincing evidence exists before allowing such evidence to reach the jury. *See State v. Anthony*, 218 Ariz. 439, 444, ¶ 33 (2008) (trial judges must find

clear and convincing proof as to the commission of the other bad act and that the defendant committed the act). The record indicates the court knew the correct standard when it found the other act evidence admissible. We therefore presume the court "necessarily concluded" clear and convincing evidence showed Worrell committed the other acts. *See State v. Vega*, 228 Ariz. 24, 29, ¶ 19 (App. 2011).

**¶14**　　　We further conclude the record contains clear and convincing evidence the fractures to C.W.'s metatarsal and tibia bones "were committed and that the defendant committed [them]." *See State v. Terrazas*, 189 Ariz. 580, 582 (1997); *see also State v. Uriarte*, 194 Ariz. 275, 282, ¶ 35 (App. 1998) (permitting appellate court, on review, to determine whether clear and convincing evidence supported admission of other-act evidence). "Clear and convincing evidence creates a high probability that a proposition is true but need not establish that it is certainly or unambiguously true." *Vega*, 228 Ariz. at 29, ¶ 19 n.4 (citations omitted).

**¶15**　　　Two of the State's expert medical witnesses testified the skeletal survey x-rays showed healing fractures of C.W.'s metatarsal and tibia bones. Worrell did not challenge the existence of the fractures. The evidence is clear and convincing the fractures occurred.

**¶16**　　　The nurse practitioner testified the fractures could have occurred up to ten days before the x-rays were taken or months prior. Although C.W. remained in his foster parents' care ten days before the skeletal survey, no evidence suggested his injuries occurred while in their care. Worrell rejected the notion H.W. could have caused C.W. harm, and no evidence pointed to other caretakers bearing responsibility for C.W.'s injuries. Worrell also admitted to causing C.W.'s rib and arm fractures. His custody of C.W. during much of the relevant time period and his failure to provide an alternative medical explanation make him the most likely culprit of C.W.'s additional fractures. Although the evidence was circumstantial, it established a high probability that Worrell caused C.W.'s additional injuries.

**¶17**　　　We are unpersuaded by Worrell's argument that the risk of unfair prejudice substantially outweighed the probative value of the other act evidence. Evidence of the metatarsal and tibia fractures was relevant because it tended to show the injuries underlying the charged counts were not accidental. *See, e.g., State v. Hernandez*, 167 Ariz. 236, 239 (App. 1990) (doctors' testimony that victim suffered from battered child syndrome prior to charged injuries admissible as other act evidence to show "absence of accident"). Worrell argues the other act evidence was prejudicial because it

was weak. But that argument goes to the weight of the evidence, not to the risk the evidence would be unfairly prejudicial, as Rule 403 demands. *See State v. Schurz*, 176 Ariz. 46, 52 (1993) (unfair prejudice means an undue tendency to suggest decision on an improper basis such as emotion, sympathy, or horror).

**¶18** The State did not introduce evidence of the metatarsal and tibia fractures on an improper basis, the evidence was "adversely probative in the sense that all good relevant evidence is." *Id.* To the extent the evidence showing Worrell caused the fractures was weak, we presume jurors followed the superior court's instructions (1) to consider the other-act evidence only if the State proved by clear and convincing evidence the fractures occurred and Worrell caused them, and (2) to evaluate expert testimony as any other testimony, meaning they could accept or reject it, in whole or in part, and could decide how much weight, if any, to give it. *See* Rev. Ariz. Jury Instr. Stand. Crim. 17 (expert witness), 24 (other acts) (4th ed. 2016).

## II. Expert Testimony on Ultimate Issue

**¶19** Worrell also argues the superior court erroneously permitted the State's expert medical witnesses to testify on the ultimate issue of his guilt. In particular, Worrell challenges the experts' testimonies that C.W.'s injuries resulted from "child abuse" or "nonaccidental" trauma. Worrell also complains the court should have precluded the experts from speculating about what specific acts might have caused C.W.'s injuries.

**¶20** We review the admission of expert testimony for an abuse of discretion. *State v. Conner*, 249 Ariz. 121, 126, ¶ 25 (App. 2020). Because Worrell did not object to the experts' testimony at trial, he must not only show the court abused its discretion by not striking the testimony *sua sponte*; he must also demonstrate the error "was both fundamental and prejudicial." *State v. Escalante*, 245 Ariz. 135, 140, ¶ 12 (2018).

**¶21** A qualified expert may provide testimony, including opinion testimony, that "will help the trier of fact to understand the evidence or to determine a fact in issue." Ariz. R. Evid. 702(a). In doing so, the expert may provide an "opinion upon a subject even though it may involve an opinion on an ultimate fact to be determined by the trier of fact." *State v. Owens*, 112 Ariz. 223, 227 (1975); *see also* Ariz. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."). An expert may not, however, "state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime

charged or of a defense." Ariz. R. Evid. 704(b); *see also State v. Sosnowicz*, 229 Ariz. 90, 97, ¶ 25 (App. 2012) ("Although an expert's opinion may 'embrace' an ultimate issue under Rule 704, an expert is not permitted to tell a jury how to decide a case.").

**¶22** The average juror lacks the expertise to determine the cause of bone fractures in a child, including whether they were accidentally or intentionally inflicted. Jurors may be at a particular loss where the child is unable, because of age or circumstance, to testify how the injuries occurred. *See, e.g., State v. Moyer*, 151 Ariz. 253, 255 (App. 1986). In cases alleging injuries to infants, a medical expert may offer a diagnostic opinion that "assist[s] the jury in evaluating how the injuries occurred, whether accidentally or intentionally inflicted." *Hernandez*, 167 Ariz. at 237-39 (doctor's testimony that child's injuries were most likely caused by violent shaking and were consistent with battered child syndrome was admissible); *see also Owens*, 112 Ariz. at 226-27 (doctor's testimony that baby's throat laceration was not an accidental injury was admissible).

**¶23** The superior court did not abuse its discretion by allowing the experts' testimony that C.W.'s injuries resulted from "child abuse" or "nonaccidental" trauma. The expert medical testimony offered in this case was relevant and helpful to the jury, without being impermissibly intrusive. The experts couched their opinions on the likely cause of C.W.'s injuries in language emphasizing its medical character. The emergency room doctor testified that though he "suspected" C.W.'s injuries resulted from "child abuse," he could not "say for sure" because he did not "know what happened" and his opinion was limited to a "medical," not a "legal," determination. Although one of the State's designated experts opined C.W.'s injuries were caused by "nonaccidental trauma or child abuse," that expert made clear her conclusion was based on her "professional opinion" and agreed, on cross-examination, her conclusion was a "medical diagnosis." Similarly, although the nurse practitioner testified C.W.'s injuries were "inflicted" by another person and "not accidental," she also testified her conclusion was her "professional opinion" and that C.W.'s injuries were "consistent" with child abuse, suggesting she could not confirm child abuse as the cause.

**¶24** Nor did the superior court abuse its discretion by allowing the nurse practitioner to testify, without objection by Worrell, about "a possible mechanism" for C.W.'s injuries. The nurse practitioner suggested C.W.'s right upper arm could have been broken by "direct force," "hitting the surface of the arm," or by "being manipulated by indirect force and . . . snapping." She opined the rib fractures could have been caused by someone

"stepping on [C.W.], kicking him or just squeezing tightly." And she hypothesized the left forearm fracture could have resulted from a "grabbing/twisting" motion. Although her testimony was conjectural to some degree, the nurse practitioner based her opinion on her own experience and specialized knowledge. Jurors could have found this testimony useful in evaluating the circumstances underlying C.W.'s fractures—including whether they could have been accidental and to what extent a person causing those injuries might have been aware of the risk of harm.

¶25        The nurse practitioner acknowledged, on cross-examination, that she could not say "specifically . . . how each injury occurred" and that she never reviewed any police reports or statements by C.W.'s parents. Although the evidence was prejudicial in that it placed Worrell—as the suspected culprit—in a negative light, we cannot say the risk of "unfair" prejudice substantially outweighed the testimony's probative value.

¶26        In sum, the expert testimony did not overstep the bounds of permissible opinion testimony. Each expert's testimony assisted the jury "in interpreting and/or understanding the circumstances of the victim's [injuries]." *See Sosnowicz*, 229 Ariz. at 97. In no case did a State expert opine that the person inflicting C.W.'s injuries did so with criminal negligence, recklessly, knowingly, or intentionally. And the experts' testimony did not prevent jurors from concluding Worrell caused C.W.'s injuries without culpable criminal intent.

## III.        Sufficiency of the Evidence

¶27        Worrell contends the jurors convicted him on insufficient evidence. He argues his purported confession does not support the verdicts because the interrogating detective used tactics associated with a risk of obtaining false confessions. Worrell denied any wrongdoing dozens of times before finally succumbing to the detective's tactics and the acts Worrell confessed to were incompatible with expert testimony about how C.W.'s injuries likely occurred. Worrell also contends that even if sufficient evidence showed he fractured C.W.'s right humerus (Count 2), that evidence did not show he did so knowingly or intentionally.

¶28        We review whether sufficient evidence supports a conviction *de novo*, "resolv[ing] any conflicts in the evidence against the defendant and view[ing] all facts in the light most favorable to supporting the verdict." *State v. Pena*, 235 Ariz. 277, 279, ¶ 5 (2014). A defendant's claim of insufficient evidence fails if the record contains "substantial evidence" to

support the conviction, which is "evidence that reasonable persons could accept as sufficient to support a guilty verdict beyond a reasonable doubt." *Id.* (citation omitted). Reversible error based on insufficiency of the evidence occurs only when there is a complete absence of probative facts to support the conviction. *State v. Soto-Fong*, 187 Ariz. 186, 200 (1996).

**¶29** Substantial evidence supports each of Worrell's convictions. The State tried Worrell on two counts under A.R.S. § 13-3623(B)(1), which required it to prove that "[u]nder circumstances other than those likely to produce death or serious physical injury to a child," Worrell "intentionally or knowingly" caused C.W. "to suffer physical injury or abuse." The trial judge instructed the jurors that if they did not find Worrell acted intentionally or knowingly, they could alternatively consider whether he committed child abuse recklessly or with criminal intent. *See* A.R.S. § 13-3623(B)(2), (3).

**¶30** Worrell admitted he pushed C.W.'s right arm down until he heard a "pop" and that he earlier noticed injuries to C.W.'s ribs and left forearm after pulling him from the changing table to the ground. The State's designated expert testified those acts were consistent with C.W.'s fractures of his right humerus, ribs, and left forearm. It is the role of the jury to decide whether Worrell's confession was false or truthful, and we do not reweigh their resolution of inconsistencies in the evidence. *See State v. Parker*, 113 Ariz. 560, 561–62 (1976).

**¶31** Substantial evidence also supports the finding that Worrell broke C.W.'s right humerus intentionally or knowingly. Intentionally means "with respect to a result or to conduct described by a statute defining an offense, that a person's objective is to cause that result or to engage in that conduct." A.R.S. § 13-105(10)(a). Knowingly means "with respect to conduct or to a circumstance described by a statute defining an offense, that a person is aware or believes that the person's conduct is of that nature or that the circumstance exists. It does not require any knowledge of the unlawfulness of the act or omission." A.R.S. § 13-105(10)(b).

**¶32** When Worrell broke C.W.'s right humerus, he knew he had previously injured C.W.'s ribs and left forearm. Furthermore, when speaking to the detective about C.W.'s humerus injury—before admitting he caused it—Worrell asserted the broken humerus could not have been accidentally inflicted given the amount of force it would have taken to cause the break. Jurors could reasonably conclude Worrell intentionally or knowingly broke C.W.'s right arm.

**IV.        Juror Misconduct**

**¶33**        Finally, Worrell argues the superior court should have conducted an inquiry into Juror Number 7's ability to judge the case fairly because that juror's repeated tardiness suggested she lacked interest in the trial. We review a trial court's decision whether to investigate alleged juror misconduct for an abuse of discretion. *State v. Davolt*, 207 Ariz. 191, 207, ¶ 56 (2004). Because Worrell did not raise any concern about Juror Number 7 until moving for a new trial, he must establish both fundamental error and prejudice. *See State v. Burns*, 237 Ariz. 1, 26, ¶ 112 (2015).

**¶34**        In its response to Worrell's motion for a new trial, the State acknowledged Juror Number 7 arrived late on two of the six trial days but argued juror tardiness or inattentiveness was not recognized as a ground for a new trial. *See* Ariz. R. Crim. P. 24.1(c)(3). The superior court denied Worrell's motion, and Worrell does not challenge that decision on appeal.

**¶35**        Worrell cites no trial transcripts in the appellate record—nor have we independently discovered any—that document Juror Number 7's tardiness or confirm Worrell's assertion that the superior court expressed concern about that juror. This absence in the record is particularly telling because of other, well-documented measures the court took to address other instances of juror misconduct. The court excused one juror for falling asleep and excused another for conducting independent research. On the record presented, Worrell fails to show the court abused its discretion by not conducting an inquiry into Juror Number 7's fitness to decide the case.

**CONCLUSION**

**¶36**        We affirm.

