*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JASON THOMAS HARRIS,

        Defendant-Appellant.

UNPUBLISHED
February 22, 2024

No. 359675
Genesee Circuit Court
LC No. 19-046043-FC

Before: M. J. KELLY, P.J., and JANSEN and GARRETT, JJ.

PER CURIAM.

Defendant, Jason Harris, appeals as of right his convictions, following a jury trial, of first-degree premeditated murder, MCL 750.316(a)(1), solicitation of murder, MCL 750.157b(2), and delivery of a controlled substance causing death, MCL 750.317a. The trial court sentenced Harris to life in prison without parole for the first-degree murder conviction, and concurrent paroleable life terms for each of the remaining convictions. Because there are no errors requiring reversal, we affirm.

## I. BASIC FACTS

This case arises following the death of Harris's wife, Christina Harris, due to heroin toxicity. The prosecution's theory at trial was that Harris intentionally killed Christina by mixing a fatal dose of heroin into her cereal the night before she was discovered dead in her bed. In support of its theory, the prosecution presented testimony showing that Harris was unhappy with Christina, but that he did not want a divorce because he did not want to pay child support or lose custody of their two children. Harris was having affairs with multiple women. Christina had been aware of the affairs and had confided in family and co-workers that Harris had been texting another woman while she was having a C-section to deliver her and Harris's youngest child. She told one of her co-workers that if she turned up dead, it was Harris. When asked if she was serious, she stated that she was.

Harris told his co-workers that he did not believe that the second child was his. He also complained that after giving birth Christina was depressed, was staying in bed, and would not go to work. He complained often about her "nagging" him. One of Harris's co-workers believed that

he might have told the police that Harris had informed him that he wished Christina was dead. He described Harris and Christina's relationship as "toxic," and recalled that they often argued.

Prior to her death, on at least two occasions, Harris procured drugs that he put in drinks that he had given to Christina. Both times she was able to detect the taste of the drugs he had added to the drinks. He asked a co-worker for a drug that was odorless, tasteless, and not noticeable in a drink. He explained that he wanted to knock Christina out so that she would not feel anything. When he told another co-worker that Christina had detected Klonopin that he had put in her water, the co-worker declined to provide him with additional pills. That co-worker testified that Harris told him that he wanted to crush Xanax and put it into Christina's cereal to stop her from "nagging" him. The co-worker thought he was joking.

Harris told a co-worker that he had hired someone to kill Christina, but that the person had gotten arrested before he could kill Christina. Harris asked that same co-worker to kill Christina in exchange for $10,000, which would be paid out of a $100,000 life insurance policy that Christina had with her employer. The co-worker declined. He believed that Harris was just venting when he complained about his wife and that the request to kill her was nothing more than an unfunny joke. He recalled the conversation to be something along the lines of "I'm tired of her, I'm gonna [get] rid of her." After Christina's death, Harris admitted to a police officer that he had purchased and gave to Christina eight Vicodin pills that he believed might have actually been heroin in pill form. He believed that she might have taken all 8 pills at once, but denied administering them to her and denied seeing her ingest the pills. The officer believed that Harris was "fake crying" when he discussed how he had inadvertently given Christina heroin.

On the morning of September 29, 2014, Harris dropped his two children off at daycare on his way to work. Later that morning, he texted a neighbor and asked her to check on Christina because she was not answering his phone calls. The neighbor saw that the family van was in the driveway, but Christina did not come to the door. She entered the house and found Christina lying in bed unresponsive. She asked Harris if she should try to wake her up. He responded that Christina had probably overslept and that he was coming to the house. The neighbor returned inside and uncovered Christina. Because Christina felt cold and had foam coming from her mouth and nose, the neighbor called both 911 and another neighbor, who was a registered nurse. The 911 operator asked about needles, but the neighbor who discovered Christina's body did not see any at the scene. The neighbor who was a registered nurse testified that Christina was cold, stiff, had no pulse, and had a white, foamy substance coming from her mouth. She did not try to resuscitate Christina because she was dead. The paramedics that responded to the scene pronounced Christina dead.

Harris told his supervisor that he had asked a neighbor to check on Christina and that he had to go home because Christina was unresponsive. When he arrived at the house, witnesses testified that he did not appear concerned or to be in a hurry. He went into the house without saying anything to the neighbor that he had asked to check on Christina.

Later that morning, Harris called Christina's supervisor at work. He told her that Christina had died the night before, and he inquired about collecting the $100,000 death benefit on Christina's life insurance policy through work. One of Harris's mistresses also testified to being contacted by Harris on the day that Christina died; she testified that Harris told her that Christina

had died of a drug overdose. Later that evening, the neighbor whom he had asked to check on Christina saw him in the driveway. She stated that he told her that Christina was "not the angel her parents think she is" and that his child was going to have to know the good and bad about Christina. The neighbor stated that he "got disgusted" and complained that Christina could not even hold a baby bottle the night before. He said that Christina dropped her bowl of cereal and that he told her to go to bed. Harris also told the neighbor that Christina was tossing, turning, and thrashing around during the night and that he had heard her cough before he left for work. He wondered if that had been her last breath. Harris repeated to a police officer that Christina had been coughing profusely when he left the home. He also told the police that Christina was falling asleep while eating cereal the night before her death. Finally, Harris told Christina's mother that, before her death, Christina had complained that her water had a chemical taste.

Within one week of Christina's death, Harris and his mother went in person to Christina's workplace to inquire about the life insurance proceeds. Additionally, Harris collected a $20,000 death benefit from a life-insurance policy issued by his employer. Not long after Christina's death, one of Harris's mistresses moved in with Harris and his children. Christina's mother believed that the mistress moved in after Christina's funeral; however, Harris's neighbor testified that the mistress moved in after Christina's death, but before her funeral. She added that Harris's adult children from a prior had marriage moved into the house within days of Christina's death.

The county medical examiner, Dr. Brian Hunter, submitted postmortem blood and urine samples for laboratory testing. The laboratory analyses revealed 100 ng/mL morphine in Christina's blood and 340 ng/mL 6-Monoacetylmorphine (6-MAM) in her urine. Her urine was also "presumptively positive" for opiates and benzodiazepines; however, further testing was needed to confirm the positive presumptions and no further testing was requested. Dr. Hunter determined that the test results were consistent with ingestion of a fatal dose of heroin. Dr. Hunter initially determined that the manner of death was accidental, possibly from recreational use of heroin. However, no needle marks were found on Christina's body and investigators did not find any drug paraphernalia, such as powder residue or rolled up paper, near the bed where Christina was found.

No one suspected that Christina used drugs: not her family, her neighbors, or her co-workers. She tested negative for substances, including opioids, when drug tested at work and at the hospital when she had her second child. The second child was four months old when Christina died. Christina had been breastfeeding. Both Harris and Christina's mother stated that Christina was careful about what she put into her body because she was breastfeeding and did not want it to negatively affect her baby. Because she was working, Christina would pump her breastmilk and store it in a freezer. Some of the frozen breastmilk was stored at Christina's mother's house. Three bags of the milk were tested for opioids. The test results were all negative. Only one witness testified to Christina having a history of drug use and that was Harris's sister. She stated that she had seen Christina use marijuana and Vicodin. Further, the record reflects that Dr. Hunter was told that on one occasion Christina had crushed a pill and snorted it.

Christina's mother and stepfather suspected that Harris surreptitiously poisoned Christina with heroin. In 2016, the Michigan State Police took over the investigation into Christina's death. Subsequently, in 2019, after being deposed in a wrongful-death action brought against Harris by Christina's family and after reviewing the police file, Dr. Hunter amended Christina's death

certificate and postmortem report by changing his manner-of-death finding from "accidental" to "homicide." Harris was charged with first-degree murder, solicitation of murder, and delivery of a controlled substance causing death.

At trial, Dr. Hunter and a toxicologist, Dr. Bryan Judge, testified in support of the prosecution's theory that Christina died by orally ingesting a fatal dose of heroin. Dr. Judge concluded that Christina must have ingested heroin. When asked how she took it, he stated that it was "extremely unusual that there are no drugs or drug paraphernalia at the scene or evidence of track marks, needles, rolled up dollar bills, powder residue, things of that nature." Such items "are invariably at the scene of an opioid overdose associated with heroin or fentanyl." Dr. Hunter's autopsy report made no mention of track marks. Dr. Judge stated that when heroin is taken intravenously "particulate matter from the intravenous injection will end up in the lung vasculature and you can actually pick that up in a cross-section under the microscope." Dr. Hunter's microscopic analysis of lung tissue showed "no evidence of material." Dr. Judge stated that when heroin is snorted, there would usually be a rolled-up piece of paper or dollar bill and powder residue at the scene. Powder residue remained in the user's nasal cavity after use. However, this would have been difficult to detect because Christina had vomit on her face and foam in her mouth.

Dr. Judge further testified that Christina's difficulty staying awake while eating cereal was consistent with eating heroin. Death from eating heroin, he opined, could take from 20 minutes to several hours. Based upon the laboratory testing which showed that she had 6-MAM in her urine, he estimated that she had died hours after taking the heroin. He added that, although heroin tastes bitter, it could be "cut" with substances that would dilute the taste, and he believed it would be unlikely to be detected if it were in milk.

The jury convicted Harris as charged.

Harris moved for a new trial on grounds of ineffective assistance of his trial lawyer and requested a *Ginther*[1] hearing. As relevant to the issues raised on appeal, he argued that his trial lawyer was ineffective for failing to investigate the scientific basis of Dr. Judge's testimony. In support of his motion, he submitted an affidavit from Dr. William Sawyer, a toxicologist, who opined that Christina could not have ingested the heroin orally because the gastric acid in her stomach would have broken down the 6-MAM before it entered her bloodstream or urine. He also stated that the amount of heroin necessary to produce the postmortem 6-MAM level in her urine could not have been put into her food without her noticing the taste. Finally, Dr. Sawyer opined that her death had occurred quickly. Harris also argued that his trial lawyer was ineffective for failing to object to Dr. Hunter's testimony that he changed his findings regarding the manner of death from accidental to homicide. He argued that Dr. Hunter's opinion as to the manner of death invaded the province of the jury because he relied upon nonmedical facts that the jurors could decide for themselves without expert assistance. The trial court denied Harris's motion without conducting a *Ginther* hearing.

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

After filing a claim of appeal in this Court, Harris filed a motion for a *Ginther* hearing, which was denied "for failure to persuade the Court of the necessity of a remand at this time," but "without prejudice to a case call panel of this Court determining that remand is necessary once the case is submitted on a session calendar."[2] Thereafter, this Court granted Harris's motion to expand the record to include Dr. Sawyer's supplemental affidavit, which was submitted as appendix B to his brief on appeal.[3] We later granted the prosecution's motion to expand the record to include Dr. Judge's in-depth response to Dr. Sawyer, which was submitted as Appendix 2 to the prosecution's brief on appeal.[4]

Subsequently, Harris filed a renewed motion for a *Ginther* hearing. In support, he attached an affidavit from his appellate lawyer averring Harris's trial lawyer told her that "he did not seek an independent expert opinion of the prosecution's evidence and he did not consult an independent toxicologist." Rather, he told her that his "trial strategy was to demonstrate that Dr. Hunter's manner-of-death opinion was founded on 'bad information' that he had received" after he formed his initial opinion. In response to Harris's renewed motion, the prosecution submitted an affidavit from Harris's trial lawyer. In the affidavit, Harris's trial lawyer averred that he "did not seek an independent expert opinion to refute the testimony of the prosecution's expert witness at trial." He explained that his choice "was a matter of trial strategy" because he thoroughly cross-examined Dr. Hunter "and was able to bring out to the jury that Dr. Hunter changed his manner of death opinion . . . based on information that he had received during a civil lawsuit on this case and/or other information than his investigation." He added that his strategy was "to focus on the fact that Dr. Hunter changed his opinion on the manner of death based upon inaccurate facts and circumstances that were presented to him due to pressure placed upon the police and prosecution by the victim's family over a three-year period." He added "it was—and still is—my belief that consulting with an expert witness of how heroin is metabolized by the body and the manner of administration of that heroin was not helpful to the defense of Mr. Harris because the defense strategy was that it was an accidental death and not a homicide."

The parties have not requested this Court to expand the record to include these affidavits. However, given that we have already expanded—at the parties' requests—the record to include additional evidence related to Harris's trial lawyer's failure to investigate the factual basis for Dr. Judge's expert testimony, we exercise our discretion under MCR 7.216(A)(4) to expand the record to include the affidavit from Harris's appellate lawyer and the affidavit from his trial lawyer.

---

[2] *People v Harris*, unpublished order of the Court of Appeals, entered June 8, 2023 (Docket No. 359675).

[3] *People v Harris*, unpublished order of the Court of Appeals, entered August 18, 2023 (Docket No. 359675).

[4] *People v Harris*, unpublished order of the Court of Appeals, entered October 19, 2023 (Docket No. 359675).

In light of the expansion of the record, an evidentiary hearing is not necessary to decide the issues raised on appeal. We, therefore, deny Harris's renewed request for a *Ginther* hearing. See MCR 7.211(C)(1)(a)(*ii*).

## II. INEFFECTIVE ASSISTANCE

## A. STANDARD OF REVIEW

Harris argues that his trial lawyer provided ineffective assistance by failing to consult and call a toxicology expert to respond to the prosecution's experts' testimony and by failing to object to portions of Dr. Hunter's testimony. Whether a defendant's lawyer provided ineffective assistance is a mixed question of fact and law. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). "A trial court's findings of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *Id*. Because no *Ginther* hearing was conducted, our review of Harris's claims of ineffective assistance are "limited to mistakes that are apparent on the record." *People v Mack*, 265 Mich App 122, 125; 695 NW2d 342 (2005).

## B. ANALYSIS

In order to prevail on a claim of ineffective assistance, a defendant must demonstrate that (1) his lawyer's performance fell below "an objective standard of reasonableness under prevailing professional norms," and (2) there is a reasonable probability that, but for his lawyer's unprofessional errors, the result of the trial would have been different. *People v Gioglio (On Remand)*, 296 Mich App 12, 20; 815 NW2d 589 (2012), vacated not in relevant part 493 Mich 864 (2012) (quotation marks and citation omitted). When considering if the defendant's lawyer's performance was deficient, this Court considers "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *People v Leffew*, 508 Mich 625, 637; 975 NW2d 896 (2022). To show prejudice, the defendant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. "Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise." *People v Traver*, 328 Mich App 418, 422; 937 NW2d 398 (2019) (quotation marks and citation omitted).

## 1. FAILURE TO CONSULT OR CALL A TOXICOLOGY EXPERT

Harris contends that his trial lawyer provided ineffective assistance by failing to consult or call as a witness a toxicology expert to refute the prosecution's expert witnesses. The prosecution argues that Dr. Sawyer's opinion was refuted by the posttrial affidavits of its own experts, and therefore, it was not objectively unreasonable for Harris's lawyer to decline to consult or call an expert whose opinion is not based on valid science or supported by the evidence. "Generally, expert testimony is not admissible unless the trial court first determines that the expert's theories, methodology, and underlying data are reliable under MRE 702, which in turn, incorporates the standards of reliability that the United States Supreme Court established in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993)." *People v Spaulding*, 332 Mich App 638, 658; 957 NW2d 843 (2020). "A '*Daubert* hearing' is simply an evidentiary hearing under MRE 702 and MCL 600.2955 specifically to make the threshold determination that the trier

of fact is not called on to rely in whole or in part on an expert opinion that is only masquerading as science." *Spaulding*, 332 Mich App at 658 (quotation marks and citation omitted).

Dr. Sawyer cited scientific literature supporting his opinion that gastric acid breaks down 6-MAM in the stomach before it can pass to the bloodstream and urine at the level detected in Christina's urine. Dr. Judge responded in a posttrial affidavit that the literature does not support Dr. Sawyer's opinion because the number of subjects was too small. He also stated that the subjects had histories such as addiction and chronic pain that affected their body's response to the heroin. Dr. Judge also described how variables such as the purity of the heroin and the types of cutting agents slows the deacetylation process, allowing 6-MAM to pass to the bloodstream and urine. Although the posttrial affidavits establish disagreements between Dr. Sawyer and the prosecution's experts, the affidavits alone do not establish the legitimacy or illegitimacy of Dr. Sawyer's opinion. On the present record, it cannot be determined whether Dr. Sawyer's opinion is "masquerading as science," *Spaulding*, 332 Mich App at 658, or whether the disagreement constitutes a legitimate battle of the experts. Moreover, to the extent that there are disagreements between Dr. Sawyer's opinion and the opinions of the prosecution's experts, it is preferable to subject those disagreements to cross-examination and resolution by the trier of fact rather than attempt to resolve them on the basis of competing affidavits. See *People v Unger*, 278 Mich App 210, 240; 749 NW2d 272 (2008) ("When the expert testimony is relevant to a substantial, disputed issue in the case, and each expert's testimony is otherwise competent, resolution of the conflict between the experts must be left solely to the finder of fact").

The prosecution also asserts that the failure to consult or call a toxicology expert was a matter of trial strategy. "When evaluating claims of ineffective assistance of counsel, a defendant must overcome the strong presumption that counsel's performance constituted sound trial strategy." *People v Thurmond*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 361302); slip op at 12. We will not second-guess the defendant's lawyer regarding matters of trial strategy, nor will we assess his or her competence with the benefit of hindsight. *Traver*, 328 Mich App at 422-423. However, a defendant's lawyer "always retains the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). A court cannot, therefore, "insulate the review of counsel's performance by calling it trial strategy." *Id*. Rather, "a court must determine whether the 'strategic choices [were] made after less than complete investigation,' and any choice is reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " *Id*., quoting *Strickland v Washington*, 466 US 688 at 689; 104 S Ct 2052; 80 L Ed 2d 674 (1984) (alteration in original).

In this case, Harris's lawyer made a strategic decision to not consult with or call a toxicology expert to refute the prosecution's expert witnesses. The proffered reason for that decision was because he believed it would be sufficient to cross examine Dr. Hunter regarding his decision to change his manner-of-death determination from accidental to homicide. However, Harris's lawyer took no steps to evaluate the prosecution's expert testimony regarding the manner in which heroin is broken down by the human body, including whether the toxicology results supported the prosecution's theory that Christina orally ingested a fatal dose of heroin. Further, the record does not demonstrate that Harris's lawyer had the requisite familiarity with how oral ingestion of heroin affects the body to justify his decision to not consult with an expert. As demonstrated by Dr. Sawyer's affidavit, there is some scientific dispute regarding whether

ingesting heroin orally will or will not result in 6-MAM being produced in the person's urine. By not consulting an expert (or conducting any independent investigation into the basis for the prosecution's expert's testimony), Harris's lawyer remained unaware of the possibility of either presenting his own witness to counter the prosecution's experts or cross-examining the prosecution's witnesses based upon information he learned from either an independent investigation or the consultation with his own expert. We conclude that his decision was objectively unreasonable. See *People v Ackley*, 497 Mich 381, 391; 870 NW2d 858 (2015) (concluding that the defendant's lawyer's "sparse efforts" were insufficient to satisfy his "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.") (quotation marks and citation omitted). Harris, therefore, has satisfied the first prong of his ineffective-assistance claim.

Harris has not established that, but for his lawyer's error, there is a reasonable probability that the result of the trial would have been different. "Reasonable probability means a probability sufficient to undermine confidence in the outcome." *Leffew*, 508 Mich at 637 (quotation marks and citation omitted). Harris points out that Dr. Sawyer's opinions contradicted the prosecution's theory that Christina died as a result of Harris putting heroin in her cereal. Specifically, he points out that Dr. Sawyer opined that, based upon the quantity of 6-MAM in Christina's urine, she would have had to have ingested several packets of street-grade heroin. He opined that, because heroin has a bitter taste, she would have likely detected the heroin in that quantity if it had been placed in her cereal. Dr. Sawyer also opined that the presence of 6-MAM in Christina's urine established— definitely—that she had not orally ingested the heroin. In his opinion, because there was no evidence of injection and because she could not have 6-MAM in her urine if she had orally ingested it, the likely method of ingesting was insufflation. We conclude that, although such evidence could possibly have affected the jury verdict, in this case, in light of the overwhelming evidence of guilt and the sheer fiendishness of his actions, there is not a reasonable probability that a different outcome would have been likely but for Harris's lawyer's failure to consult with and call a toxicology expert to rebut the prosecution's experts.

Harris had a motive to kill Christina. He was having an affair, thought that she was cheating on him, and was tired of her nagging him. He specifically stated to many people that he did not want a divorce because he did not want to pay child support or lose custody of the children. Before her death, he told a co-worker that he wished Christina were dead. He even solicited a co-worker to murder Christina in exchange for $10,000. On multiple occasions prior to Christina's death, he purchased drugs and put them into beverages that he then gave to her to consume. When she detected the taste, he sought out odorless and tasteless drugs that he could conceal in her drink. He also voiced a plan to crush up Xanax and conceal it in her cereal. He disclosed to multiple people that she was falling asleep eating her cereal the night before her death. And the morning of her death, he called her workplace to inquire about a $100,000 life insurance policy. During that call, he stated that Christina had died *the night before*. Later that day, he told a mistress that Christina had died of a drug overdose and he told a neighbor that Christina was "no angel." According to a neighbor, another mistress moved into his house shortly after Christina's death, but before her funeral. Harris told the police that he had acquired eight pills that he originally thought were Vicodin, but which he later believed to be heroin in pill form. He admitted to giving the pills to Christina, although he denied seeing her take them. After her death, he continued acquiring controlled substances and was eventually fired from work due to drug use.

In order to acquit, the jury would have had to disregard this overwhelming evidence that not only did he want Christina dead, but he also had previously solicited others to kill her. Further, he had developed a method by which to carry out his plan, had the knowledge of how to acquire illicit substances and had in fact acquired controlled substances to give to Christina on multiple occasions. Additionally, the jury would have had to ignore testimony showing that, because Christina was dead, Harris was able to live with his mistress and, rather than having to pay child support or get a divorce, he received approximately $120,000 in life insurance proceeds. Indeed, he called to inquire about the policy issued through Christina's employer within hours of the paramedics determining that she was dead.

The jury also would have had to disregard substantial evidence that Christina did not recreationally use drugs. Multiple witnesses testified that because she was breastfeeding, she was careful about what she put into her body. Multiple witnesses stated that they had never suspected her of using drugs. Prior drug screens were negative for opioids. Critically, her frozen breastmilk also tested negative for opioids. In fact, the primary evidence that she used drugs came from Harris's sister, who testified that Christina used marijuana and Vicodin. Neither substance was present in the toxicology results. Moreover, Harris's sister gave statements to the police and testified at the preliminary examination. Based upon her statements and statements from others, the police suspected that Harris had murdered Christina. At trial, however, Harris's sister repeatedly testified that she did not remember any of the statements that she had made. When a juror asked how she could remember Christina's substance use, but nothing else, Harris's sister testified that it was because she had purchased marijuana and Vicodin from Christina. Thus, even during the trial, the jury expressed doubt about the sister's credibility.

To support its theory that Harris poisoned Christina's food with heroin, the prosecution presented the opinions of its experts regarding the toxicology results. For instance, Dr. Judge opined that Christina's death was consistent with having orally ingested heroin. The possibility of injection was ruled out by the absence of injection marks and a needle. Using the drug by insufflation was consistent with voluntary and recreational use, but Dr. Judge testified that insufflation was unlikely because no rolled dollar bill or paper for snorting the drug was found.

In sum, notwithstanding that Dr. Sawyer's opinions had the potential to cast doubt upon the prosecution's theory that Christina died after orally ingesting heroin that was concealed in her cereal, on this record, we conclude that Harris has not met his burden of establishing that he was prejudiced by his trial lawyer's error. He cannot, as a result, prevail on his claim of ineffective assistance.

## 2. FAILURE TO OBJECT TO EXPERT OPINION TESTIMONY

Harris next argues that his lawyer was ineffective for failing to object to portions of Dr. Hunter's testimony, during which he explained his reasons for changing his classification of the manner of Christina's death from accidental to homicide. Harris argues that much of this testimony was not based upon any specialized knowledge or expertise, and therefore, was inadmissible under MRE 702. He further argues that Dr. Hunter's testimony improperly vouched for the credibility of other persons and witnesses.

Harris contends that Dr. Hunter improperly offered an opinion on his guilt and that his trial lawyer was ineffective for failing to object to that opinion. Dr. Hunter testified:

The totality of the information I was given accomplished two things. One is very difficult to accomplish and I've got to tell you the amount of information that I received is extraordinary and far more than what I would—it's five years worth of an investigation, and it's more than I ever received on any case in just about—that I can remember. And they, in my mind as I looked at this, the first question I'd asked myself is do I have enough information here to confirm that she used this drug as my accident would indicate? My accident, manner of death would indicate that she was a regular user of the drug or experimented with drugs. Is there anything in here to tell me that? And, in fact, what the test was is can you prove the negative? Can you prove that she didn't do drugs, and in my mind, they did. When you look at the totality of the information, statements from coworkers, work record, work history by employers, friends, family, all of it said the consistent theme was she didn't use drugs, her husband said she didn't use drugs, she was always very concerned about anything she put in her body because it could have an impact on their kids if she's breast-feeding, so she was absolutely meticulous on that point.

* * *

There was a mention of an episode where she had participated in crushing up a pill and snorting it. And I asked myself, okay, does that make her a drug user? And I asked, okay, well, if you smoke marijuana one time does that make you a chronic drug user? And the answer is no. If you drink alcohol, does that make you an alcoholic? No. I received no other information to indicate that was a chronic issue, and I actually looked at lung sections, and people who crush up pills and snort them, what happens is if you do that regularly enough, there are parts of the pill which are non-dissolvable, they're binders, right? . . . If you snort those pills enough, you're going to get some material deposited in the lungs and you will see it. Didn't have anything there. So I thought they proved the negative. Okay.

So now I had to say, okay, the accident wasn't the appropriate manner of death.

Harris argues that Dr. Hunter's opinion regarding Christina's manner of death was improper because it was not based upon information outside a layperson's common understanding, and therefore, it was not admissible under MRE 702. We disagree because, viewed as a whole, Dr. Hunter was describing his role as a county medical examiner, which required him to form an opinion regarding a decedent's manner of death. Indeed MCL 52.202(1)(b) provides that "[a] county medical examiner or deputy county medical examiner shall investigate the cause and manner of death of an individual" in any of the circumstances enumerated in the statute, including, as relevant to this case, when "[t]he individual's death is unexpected." In performing this statutory duty, the medical examiner may consider "the circumstances surrounding the death" and "may perform or direct to be performed an autopsy and shall carefully reduce or cause to be reduced to writing each fact and circumstance tending to show the condition of the body and the cause and manner of death . . . ." MCL 52.205(2) and (3).

-10-

Moreover, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." MRE 704. However, an expert witness should not be "permitted to testify about the requirements of law which apply to the particular facts in the case or to phrase his opinion in terms of a legal conclusion." *People v McFarlane*, 325 Mich App 507, 519; 926 NW2d 339 (2018) (quotation marks and citation omitted). "In the former case, the claim is that the province of the judge is invaded, while in the latter, the contention is that the province of the jury is invaded." *Id.* (quotation marks and citation omitted). Thus, an expert witness may not offer an opinion about whether the defendant is guilty or innocent. *People v Fomby*, 300 Mich App 46, 53, 831 NW2d 887 (2013). "If the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute, then expert testimony is unnecessary." *People v Kowalski*, 492 Mich 106, 123; 821 NW2d 14 (2012) (quotation marks and citation omitted).

Harris directs this Court to *McFarlane*, 325 Mich App 507. In *McFarlane*, the Court concluded that it was permissible for an expert to express an opinion that head trauma was inflicted or not accidental, but that the expert could not proffer an opinion as to whether the person who inflicted the trauma was guilty or had a culpable mind. *Id*. at 523. That is, testimony suggesting that the inflicted trauma was "*abusive* head trauma" or that it was child abuse is improper because it "implies a level of willfulness and moral culpability that implicates the defendant's intent or knowledge when performing the act that caused the head trauma." *Id*. Because the expert testimony in that case involved a "definite case of abusive head trauma," and because the expert's testimony made plain that "abusive head trauma" meant "child abuse," the *McFarlane* Court concluded that her testimony was improper. In this case, however, Dr. Hunter opined that Christina did not voluntarily ingest heroin, but he also conceded that he did not know who had killed her. He did not, therefore, testify that Harris was guilty or that he had a culpable state of mind.

Harris also cites *State v Tyler*, 867 NW2d 136, 166 (Iowa, 2015),[5] in which the Iowa Supreme Court held that a medical examiner's opinion regarding "the cause and manner of death crossed that very thin line between testimony that assists the trier of fact and testimony that vouches for a witness's credibility." In *Tyler*, the defendant allegedly gave birth to a live infant and immediately drowned it in a bathtub. *Id*. at 148-149. The medical examiner found that the infant's cause of death was drowning and manner of death was homicide. He testified that he was unable to reach an opinion on either finding from the postmortem examination alone, but he obtained information from listening to recordings of the defendant's police interview, in which she made self-incriminating statements. *Id*. at 151-152. The defendant argued on appeal that the medical examiner's testimony was not admissible as an expert opinion because his findings were based solely on the defendant's statements. The court stated that the issue "[w]hether a medical examiner may opine on cause or manner of death when his or her opinions are based largely on uncorroborated witness statements or information obtained through police investigation is an issue of first impression in Iowa." *Id*. at 155. The court stated that there was no consensus among

---

[5] Decisions from sister states are not binding, but may be considered for their persuasive value. *Haydaw v Farm Bureau Ins Co*, 332 Mich App 719, 726 n 5; 957 NW2d 858 (2020).

jurisdictions that had addressed the issue, but noted that the caselaw generally depended "on the particular facts and circumstances of each case." *Id*. at 155, quoting *State v Sosnowicz*, 229 Ariz 90; 270 P3d 917, 923-924 (Ariz App, 2012). After surveying caselaw from other jurisdictions, the court concluded that "there is no bright-line rule for determining whether a medical examiner may opine on cause or manner of death when his or her opinions are based, in whole or in part, on such information." *Tyler*, 867 NW2d at 162.

Harris does not cite any Michigan authority holding that a medical examiner is precluded from testifying regarding a manner-of-death finding that is based in part on nonmedical evidence, within a layperson's understanding. As the foregoing discussion demonstrates, the admissibility of such testimony appears to be unsettled and there is no bright-line rule for determining the admissibility of such testimony. Harris cites *Kowalski*, 492 Mich at 123, for the general proposition that expert testimony is unnecessary if an untrained layperson "would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." However, *Kowalski* did not involve a medical examiner's testimony explaining his reasons for classifying a decedent's manner of death, which, as explained in *Unger*, 278 Mich App at 251-253, a medical examiner is statutorily authorized to determine by investigating all relevant circumstances, including circumstances that do not involve empirical medical proof.

We conclude that, in this case, Dr. Hunter's testimony did not invade the province of the jury. Consequently, Harris's lawyer was not ineffective for failing to object to his testimony. See *People v Ericksen*, 288 Mich App 192, ___; 793 NW2d (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

Moreover, Harris's argument ignores his trial lawyer's strategic reasons for not objecting to Dr. Hunter's manner-of-death testimony. During closing argument, Harris's lawyer emphasized that Dr. Hunter initially classified the manner of Christina's death as accidental because "[t]here was absolutely nothing on her body or in her lungs or anything else that pointed to anything except an accidental overdose" and he saw "no indication of anything else." He further argued that it was not until Christina's parents became upset with the local police and "stomp[ed] all over their parade and [went] over their head . . . to the Michigan State Police" that anything changed. Harris's lawyer explained that because Dr. Hunter originally classified Christina's death as accidental, authorities realized that they would not be able to prosecute Harris unless they convinced Dr. Hunter to change his manner-of-death determination. He emphasized that Dr. Hunter's decision to change his finding regarding the manner of Christina's death was not based on any new investigation or medical findings that he made, but rather was based entirely on outside information supplied by others who were motivated to persuade Dr. Hunter to change his opinion, and the reliability of Dr. Hunter's changed opinion depended on the accuracy of that outside information, which had not been demonstrated. In particular, Harris's lawyer argued:

> Until Dr. Hunter's opinion changes, they have nothing. They have to convince him different. And he was honest with you. He said my original findings as far as the body have not changed. It appears to be an accidental overdose. It's information that I received from the outside that caused me to change. The stuff that came from the parents, the police, and the prosecutors figuring out what do we have to give him to change his mind? And they needed years to come up with it.

* * *

Again, they have to give information to Dr. Hunter. *And I got Dr. Hunter to admit all of the information that I had to change my mind came from the outside. It wasn't my investigation. I didn't do it. They brought it to me.* But remember . . . it's garbage in, garbage out. If they gave him inaccurate information, then he's basing an opinion on inaccurate information just like the doctor today. . . .

* * *

The point is is that the information that was given to Dr. Hunter was inaccurate[.] . . .

* * *

So we all know it was wrong. Some of the information that went to Hunter is wrong and if Hunter is getting wrong information, how much of it was wrong before he changed it over to homicide. [Emphasis added.]

Based upon Harris's lawyer's argument, it is clear that he had a substantial interest in informing the jury that Dr. Hunter originally classified Christina's death as accidental, but because Dr. Hunter later changed that classification, the prosecutor would be permitted to also explore that issue. Further, to the extent that Harris complains that Dr. Hunter's changed opinion was based on nonmedical evidence that came from outside sources, including information that did not require any specialized expertise or that depended on the veracity of the persons who supplied the information, it is apparent that Harris's lawyer's failure to object was part of a strategy of attempting to highlight those factors in an attempt to undermine the reliability of the new homicide classification by demonstrating that, unlike the original classification of an accidental overdose, which was based entirely on Dr. Hunter's professional evaluation of objective medical evidence, the new classification was influenced solely by information—much of which Harris's lawyer argued was inaccurate—supplied by outside sources who were motivated to get Dr. Hunter to change his opinion. Considering this record, Harris has not overcome the presumption that his lawyer's failure to object to Dr. Hunter's challenged testimony was part of a sound trial strategy to demonstrate the weaknesses in the new homicide classification.

Harris also argues that his lawyer was ineffective for failing to object when Dr. Hunter improperly bolstered other witnesses' credibility. In the context of explaining his reasons for changing his manner-of-death classification from accidental to homicide, Dr. Hunter stated that he considered information supplied by one of Harris's coworkers who "put himself in jeopardy" by informing the police that he committed a crime by selling drugs to defendant. Dr. Hunter also considered statements by Harris's family members who informed the police that defendant was interested in killing Christina. Dr. Hunter explained that "these things together made me feel uncomfortable that the manner of death, the most appropriate manner of death was homicide." He also testified that because Harris had "lots of conversations with multiple people hiring hitmen to end her life, I can't say that he did it and one of the other people didn't do it, but I can say she did not do this to herself."

-13-

In *People v Musser*, 494 Mich 337; 835 NW2d 319 (2013), the prosecutor introduced statements made by detectives who interviewed the defendant, including statements that they believed the complainant. *Id*. at 343-346. The defendant argued on appeal that the trial court abused its discretion "by failing to redact numerous statements by the detectives that vouched for the complainant's credibility." *Id*. at 347. The Supreme Court held:

> Under the facts of this case, however, we find it unnecessary to adopt a bright-line rule for the automatic exclusion of out-of-court statements made in the context of an interrogation that comment on another person's credibility because the issue can be adequately addressed by our existing rules of evidence. Thus, at this juncture, we hold that where the proponent of the evidence offers an interrogator's out-of-court statements that comment on a person's credibility for the purpose of providing context to a defendant's statements, the interrogator's statements are only admissible to the extent that the proponent of the evidence establishes that the interrogator's statements are relevant to their proffered purpose. See MRE 401. Even if relevant, the interrogator's statements may be excluded under MRE 403 and, upon request, must be restricted to their proper scope under MRE 105. Accordingly, to ensure a defendant's right to a fair trial, trial courts "must vigilantly weed out" otherwise inadmissible statements that are not necessary to accomplish their proffered purpose. *People v Crawford*, 458 Mich 376, 388, 582 NW2d 785 (1998). To hold otherwise would allow interrogations laced with otherwise inadmissible content to be presented to the jury disguised as context. See *id*. [*Musser*, 494 Mich at 353-354.]

The Court held that "an interrogator's out-of-court statements must be redacted if that can be done without harming the probative value of a defendant's statements." *Id*. at 356. The Court concluded that the trial court "abused its discretion by admitting all the detectives' statements to the jury," because some statements were irrelevant to provide context for the detective's statements and some statements could have been redacted "without harming the probative value of defendant's responsive statement." *Id*. at 359-360. The Court added that "even if there was some probative value to the statements that the trial court erroneously failed to redact, the minimal probative value of those statements would be substantially outweighed by the danger of unfair prejudice to defendant under the facts of this case." *Id*. at 361. The detective's "specialized training and experience with child complainants was presented to the jury immediately before the jury reviewed the recording of the interrogation," which gave him "the same aura of superior knowledge that accompanies expert witnesses in other trials." *Id*. at 363 (quotation marks and citation omitted).

In the instant case, to the extent that Dr. Hunter commented on the perceived credibility of information received from other persons, it is clear from the record that he did so only in the context of explaining why it caused him to change his opinion regarding the manner of Christina's death. The testimony was neither offered nor used to suggest that Dr. Hunter, as a medical examiner, had any specialized expertise for determining the credibility of the information he received. Because the challenged testimony was relevant to the proper purpose of explaining why Dr. Hunter changed his classification of Christina's death to homicide, Harris has not established that the challenged testimony was inadmissible.

Additionally, Harris has not overcome the presumption that his lawyer declined to object as part of his trial strategy. As explained earlier, it is apparent that the defense strategy was to attack the reliability of Dr. Hunter's new homicide classification by highlighting that it was not based on any new medical findings or new investigation that he conducted, but rather was based solely on nonmedical evidence and information received from outside sources. Under these circumstances, Harris has not overcome the presumption that his lawyer's failure to object to this testimony was objectively reasonable.[6]

Affirmed.

/s/ Michael J. Kelly
/s/ Kathleen Jansen
/s/ Kristina Robinson Garrett

---

[6] Because we have not found that Harris's lawyer committed multiple errors, Harris is not entitled to additional relief on the basis of his argument that the cumulative effect of multiple errors by his lawyer denied him a fair trial.